**COMMONER et al., Plaintiffs,**

**v.**

**DU PONT et al., Defendants.**

**Civ. A. No. 80–421.**

United States District Court,
D. Delaware.

Oct. 7, 1980.

On Motion to Intervene Oct. 16, 1980.

John C. Andrade, Wilmington, Del., for plaintiffs; John Armor, Towson, Md., of counsel.

Roger A. Brown, Deputy Atty. Gen., Dept. of Justice, Wilmington, Del., for defendants.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

The Citizens Party held its founding convention April 11–13, 1980, and selected Barry Commoner and LaDonna Harris as its candidates for the offices of President and Vice–President of the United States, respectively. The Citizens Party has since been attempting to qualify for a position on the ballot in more than thirty–five states. Two statutory provisions have frustrated this effort in Delaware. First, Section 3001 of Title 15 of the Delaware Code specifies that, in order to be listed on the November, 1980 general election ballot, a political party must have registered in its name by August 15 a number of voters equal to .05 percent of the total number of voters registered in Delaware as of December 31, 1979, i. e., 131 voters.

Second, Section 1749 of Title 15 of the Delaware Code prohibits a registered voter from changing his party designation during the period March 1 through the day of the final primary election of a general election year, in this case September 6. As a result, the Citizens Party's recruitment efforts during this period were restricted to the pool of unregistered voters which, based on the total state population and° the total number of registered voters in the State, contains approximately 100,000 people. Plaintiffs secured only seventy–five unregistered voters before the August 15 deadline. If the signatures of registered voters who desired to change their registration during the prohibited period were included in the count, the Citizens Party would have met the requirements of 15 Del.C. § 3001.

On August 20, plaintiffs, Barry Commoner, three Delaware residents who have registered or wish to register as members of the Citizens Party, and a New Jersey voter who intends to vote for Commoner, filed suit to have 15 Del.C. § 1749 declared unconstitutional as a violation of their First and Fourteenth Amendment rights of freedom of speech and association and equal protection under the law. Jurisdiction of this Court is predicated upon 28 U.S.C. § 1343(3). The case is before the Court on plaintiffs' motion for summary judgment; there is no dispute as to any material fact.

■ Preliminarily, the Court notes that defendants have raised the defense of laches, arguing that plaintiffs were so dilatory in commencing and pressing their suit and in seeking to register voters that they should be denied any relief. First, it should be emphasized that the time at which the

plaintiffs attempted to register voters is of no concern since the August 15 deadline does not make last minute efforts proof of the "obvious procrastination" claimed by the defendants. Second, defendants have not presented the Court with any evidence of the substantial harm which they would suffer should relief be granted; such harm was essential to the holding in *Maddox v. Wrightson*, 421 F.Supp. 1249 (D.Del.1976).[1] Thus the doctrine of laches has no bearing on this case.

Plaintiffs challenge the constitutionality of the Delaware change of party designation statute either *per se* or as applied to those registered voters who wished to re-register in the Citizens Party prior to August 15. However, it is only the conjunction of § 1749 with § 3001 which may create a burden on the plaintiffs' constitutional rights by denying the Citizens Party access to the November ballot. Therefore, the Court must evaluate § 1749 as it operates in light of § 3001.

Under the Constitution, the states have the power to determine the qualifications of voters who will elect members of Congress, Art. I, § 2, cl. 1,[2] and the right to prescribe "[t]he Time, Places and Manner of holding Elections for Senators and Representatives," Art. I, § 4, cl. 1. Regulations adopted to insure fair and orderly elections are by definition restrictions on who can vote, when and where voting will take place, and who will be on the ballot.

On the other hand, "the rights of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively," have been recognized as fundamental freedoms the infringement of which is subject to strict judicial scrutiny. *Williams v. Rhodes*, 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968); *accord, Evans v. Cornman*, 398 U.S. 419, 422, 90 S.Ct. 1752, 1754, 26 L.Ed.2d 370 (1970). The Court has explicitly recognized that restrictions on access to the ballot burden both of these fundamental rights. *Illinois Elections Bd. v. Socialist Workers Party*, 440 U.S. 173, 184, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979). As a result, a state must establish that any such restriction is necessary to serve a compelling interest, *id.*, and does not "unnecessarily restrict constitutionally protected liberty." *Kusper v. Pontikes*, 414 U.S. 51, 59, 94 S.Ct. 303, 308, 38 L.Ed.2d 260 (1973). A permissible restriction has been further defined as the least drastic means of achieving an end, *Illinois Elections Bd. v. Socialist Workers Party, supra*, 440 U.S. at 185, 99 S.Ct. at 991; thus, "if there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a state may not choose the way of greater interference," *Dunn v. Blumstein*, 405 U.S. 330, 343, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274 (1972).

The Delaware statute in question, 15 Del.C. § 1749, did not play a substantial role in determining which parties would be placed on the ballot in a general election until this year. Prior to the 1978 revision of the election laws, a party could gain access to the ballot by: (1) registering voters in the party equal in number to one per cent of the registered voters in the State; (2) obtaining at least two percent of the vote in a statewide race in the preceding general election; or (3) filing petitions with the Board of Elections, with signatures of one percent of the total number of registered voters in the State, collected between January 1 and August 15. 60 *Del.Laws* Chap. 446, § 1 (effective June 7, 1976). In 1978, the General Assembly changed the requirements for ballot access by reducing the number of registered voters required

---

1. In fact, defendants have stated that necessary changes in the election ballots could be made up to October 15, and have given no explanation as to how some persons may lose their right to vote given this schedule. Defendants' Answering Brief in Opposition to Plaintiffs' Motion for Summary Judgment suggests only that absentee ballots might be delayed, without specifying the time period needed for reprinting, delivery, and return of these ballots.

2. *See Storer v. Brown*, 415 U.S. 724, 729–730, 94 S.Ct. 1274, 1278–1279, 39 L.Ed.2d 714 (1974).

and eliminating the petition and vote methods of qualifying. 61 *Del.Laws* Chap. 418, §§ 3, 7. Once registration became the only means of achieving ballot access, § 1749 assumed a concomittantly greater role in the process. Plaintiffs argue that it is nearly impossible to comply with § 3001 by registering the necessary number of unregistered voters and conclude that § 1749 in effect imposes a March 1 deadline on party qualification for ballot position.

■ In the present scheme of election laws, the purpose of § 1749 is to preserve the integrity of the electoral system principally by preventing inter–party raiding, a purpose which the Supreme Court has recognized as legitimate. *See, e. g., Rosario v. Rockefeller*, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973). Secondarily, § 1749 in conjunction with § 3001 protects the electoral system by limiting the parties on the ballot to those which have demonstrated some degree of popular support, thereby insuring that the ballot is not filled with an abundance of candidates serving only to divide and confuse rather than to consolidate the support of the populace. The Supreme Court has repeatedly recognized that a state has a legitimate interest in regulating the number of candidates on the ballot for these purposes. *See, e. g., Illinois Elections Bd. v. Socialist Workers Party, supra* 440 U.S. at 184–185, 99 S.Ct. at 990–991; *Lubin v. Panish*, 415 U.S. 709, 715, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974); *Bullock v. Carter*, 405 U.S. 134, 145, 92 S.Ct. 849, 857, 31 L.Ed.2d 92 (1972); *Williams v. Rhodes, supra.* Statutes requiring a preliminary showing of "a significant modicum of support" before a party is granted access to the ballot are reasonably designed to serve the state's legitimate interest in preventing the frustration of the democratic process. *Jenness v. Fortson*, 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971); *Illinois Elections Bd. v. Socialist Workers Party, supra.* Since the Court has equated "legitimate" with "compelling", *see, e. g., Illinois Elections Bd. v. Socialist Workers Party, supra*, this Court holds that 15 Del.C. § 1749 serves compelling state interests.

■ Plaintiffs argue that § 1749 must be evaluated with respect to the particular group or individual affected; they assert that one purpose of § 1749–to prevent inter–party raiding–does not apply to minor parties and therefore the State has no legitimate interest in imposing such requirements on individuals who wish to change their registration to minor parties. However, the State need not demonstrate that the effect of a statute on every individual furthers the intended purpose, merely that a statute furthers a legitimate interest without being unnecessarily restrictive. It is impossible to imagine a law which does not have some unintended or undesired effects; in this case there are probably many instances where members of major parties would also like to re–register when the primary candidates of the other party more nearly reflect their beliefs and interests. Such changes of registration would not work a fraud on the political system yet they are also prohibited by § 1749. All that plaintiffs can demand is that having a legitimate interest, the State pursue it reasonably and without unnecessarily restricting constitutionally protected activities.

■ The question remains whether the State has chosen an unduly or unfairly burdensome means of pursuing its legitimate interests. The cases indicate that it is not the possibility of a less burdensome method, but the degree of burden in comparison to the desired goal and the efficiency of the method which govern the question of constitutionality. Although the way of greater interference may not be chosen, *Dunn v. Blumstein, supra* 405 U.S. at 343, 92 S.Ct. at 1003, a statute is not unconstitutional as a result of the existence of other "reasonable" and less burdensome ways to achieve the legitimate objective. Nor must the State prove that a statute is "an essential part of its overall mechanism to achieve its acceptable goals." *Storer v. Brown*, 415 U.S. 724, 736, 94 S.Ct. 1274, 1282, 39 L.Ed.2d 714 (1974).

Thus, in *Rosario v. Rockefeller, supra*, the Court held that a New York election law which required that voters register eight to

eleven months before voting in a party primary was constitutional since it did not totally disenfranchise any class of residents. The statute "merely imposed a time deadline on their enrollment," *id.* 410 U.S. at 757, 93 S.Ct. at 1249, which did not constitute either a temporary or permanent ban on voting. The time limitation was not unconstitutionally severe, for it was designed to deter party raiding by putting "raiders in the unseemly position of asking to be enrolled in one party while at the same time intending to vote immediately for another." *Id.* at 762, 93 S.Ct. at 1252. The state was not required to establish that a shorter period of time would not have been equally effective, although it would have been less burdensome.

Similarly, in *American Party of Texas v. White*, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974), statutory limitations on access to the ballot were held to serve vital state objectives that could not be served equally well in "significantly less burdensome ways." *Id.* at 781, 94 S.Ct. at 1306. Instead of looking for the least burdensome means, the Court sought to determine whether the limitation was "so excessive or impractical as to be in reality a mere device to always, or almost always, exclude parties with significant support from the ballot." *Id.* at 783, 94 S.Ct. at 1307. The fact that some minor parties satisfied the requirements supported the Court's view that the regulations were neither impossible, impractical, nor too onerous.

The Court focused on the ultimate effect of the burden rather than on the possibility of less drastic alternatives in *Storer v. Brown, supra,* as well. There, the Court determined that a one–year disaffiliation statute did in fact further the state's goal of preventing splintered parties and unrestrained factionalism and outweighed the interest a candidate might have in making a late decision to run as an independent. The fact that a lesser period of disaffiliation might have been equally effective did not enter the Court's analysis. As to the other appellees who were contesting a requirement that an independent candidate file a petition with no fewer signatures than five percent of the number of votes cast in the last general election, the Court remanded the case for determination of the extent of the burden imposed. Such factors as the number of qualified voters available to sign the petition and whether a "reasonably diligent independent candidate could be expected to satisfy the signature requirements," *id.* 415 U.S. at 742, 94 S.Ct. at 1285, were suggested. While the Court observed that some requirements such as a limited time period within which to collect signatures might be unnecessary, the constitutionality of the restrictions was to depend ultimately on their total effect on the potential candidate. *See also Mandel v. Bradley*, 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977) (*per curiam*) (requiring evaluation of extent of burden and any moderating factors in determination of constitutionality of statute).

In those cases where the Supreme Court has found restrictions on access to the ballot unconstitutional, the holding has been premised on the failure of the restriction to achieve an intended goal or the excessive burden which practically prevented the desired political participation. *See, e. g., Bullock v. Carter, supra* (statutory filing fee requirement failed to test genuineness of candidacy or extent of candidate's popular support and was therefore unconstitutional); and *Lubin v. Panish, supra* (same). In *Illinois Elections Bd. v. Socialist Workers Party, supra,* the Court found that there was no reason, much less a compelling one, for requiring that candidates seeking access to the ballot in city elections meet a more stringent standard than was imposed on candidates in state elections.

Where the regulation was capable of effecting the desired objective, it was the extent of the burden rather than the existence of other means which led to a holding of unconstitutionality. In *Kusper v. Pontikes, supra,* a statute which prohibited a person from voting in the primary election of a political party if he or she had voted in the primary of any other party within the preceding twenty–three months was stricken because it absolutely precluded the plain-

tiff from voting in the 1972 Democratic primary after having voted in the 1971 Republican primary. No action other than not voting in the primary in one particular year would have allowed the plaintiff to change registration and vote in the next year's primary. *Williams v. Rhodes, supra,* invalidated a series of election laws which *inter alia* required a new party to obtain petitions signed by qualified electors totaling fifteen percent of the number of ballots cast in the last preceding gubernatorial election. The resultant virtual impossibility of qualification for any party other than the Republican and Democratic Parties was not justified by the state's interest in insuring that the election winner be the choice of a majority of its voters, that the ballot not be so confusing as to frustrate the popular will, and that the disaffected be presented with a choice of leadership. The Court focused on the "immediate and crippling impact" on basic constitutional rights, rather than the existence of alternative procedures, in reaching its conclusion.

■ Thus, given the State's legitimate interest in preventing inter-party raiding and certifying that a political party has some minimum amount of support, this Court must determine whether 15 Del.C. § 1749 in conjunction with § 3001 unconstitutionally burdens plaintiffs' rights. Plaintiffs claim that when a party such as the Citizens Party first organizes during the period when change of party designation is not permitted, the task of registering a number of unregistered voters equal to .05 percent of the total number of voters registered in Delaware as of December 31 of the

preceding year is extremely difficult, if not impossible. The Court, however, is not persuaded that the registration of 131 voters of the approximately 100,000 unregistered voters in Delaware during the course of a five-and-a-half-month period [3] is an unreasonable, much less excessive, requirement. Even if these 131 voters must be found among the most politically apathetic segment of the population, the Delaware requirement appears negligible. It may not be easy to persuade 131 unregistered voters to register, but the fact that a regulation may necessitate hard work is no reason for holding it unconstitutional. *American Party of Texas v. White, supra,* 415 U.S. at 787, 94 S.Ct. at 1309.

Further, it is difficult for this Court to understand why a candidate who specifically claims [4] to seek the support of the disaffected voter, who is also often the unregistered voter, should find it an excessive burden to collect the signatures of 131 of these citizens. Certainly plaintiff cannot claim, as did John Anderson in the cases which plaintiffs rely upon,[5] that he has been arbitrarily deterred by an early filing deadline although possessing wide community support. One of the purposes of § 1749 and § 3001 is to require that a party legitimize itself by demonstrating some modicum of popular support; plaintiffs claim to represent a party which will draw the support of that very group from which they assert it is unduly burdensome to obtain 131 signatures.

It is also relevant to note that both the Libertarian and the John Anderson Parties [6] have succeeded in qualifying for the

---

**3.** This is the period from March 1, after which a registered voter may not change his or her party designation according to § 1749, until August 15, the deadline for ballot access qualification by a party under § 3001.

**4.** In plaintiffs' Exhibit A to the Complaint, plaintiff Barry Commoner avers in his affidavit that:

> 7. A majority of those persons who have become eligible to vote since 1960 have never registered. I believe that this lack of involvement reveals a profound dissatisfaction with our current two-party system. The Citizens Party is a serious effort to revitalize the

American political system by involving those who are now disillusioned by the limited choices available.

**5.** *Anderson v. Celebrezze,* 491 F.Supp. 121 (S.D.Ohio 1980); *Anderson v. Hooper,* 498 F.Supp. 905 (D.N.M.1980); *Anderson v. Mills,* 491 F.Supp. 1231 (E.D.Ky.1980); *Anderson v. Quinn,* 495 F.Supp. 730 (D.Me.1980); *Anderson v. Morris,* 500 F.Supp. 1095 (D.Md.1980).

**6.** In Delaware, unlike in other states, John Anderson will appear on the ballot as the candidate of the John Anderson Party.

Delaware ballot in 1980. The John Anderson Party succeeded in registering 131 voters during the March–August period. Even if Anderson had less difficulty in registering voters as a result of greater publicity, his success in fulfilling the requirement is indicative of the degree of community support which § 1749 and § 3001 were in part designed to insure.

■ Since the Court finds that the registration requirement is minimal, it obviously cannot conclude that § 1749 in effect imposes a March 1 deadline on the § 3001 qualification procedure. Given the moderate number of signatures required, the pool from which they may be gathered, the period of time allowed, and the achievement of these requirements by other minor parties, the Court concludes that 15 Del.C. § 1749 does not unconstitutionally infringe upon plaintiffs' First and Fourteenth Amendment rights to vote effectively and to associate politically.

■ Plaintiffs have also claimed relief under the Equal Protection Clause although all parties are accorded exactly the same treatment under § 3001 and § 1749. Moreover, plaintiffs seek to rely on recent cases in which John Anderson qualified for the ballot in Ohio, New Mexico, Kentucky, Maine and Maryland. Yet, in all of these cases, Anderson challenged laws setting different filing deadlines for independents and partisans. Of course, where individuals or groups are differently situated, equal treatment may be the denial of equal protection. *Jenness v. Fortson, supra* 403 U.S. at 442, 91 S.Ct. at 1976. In this case, however, any burden suffered by the plaintiffs is suffered equally by other parties and their members. With respect to parties, the equal protection doctrine does not require that the burden of organization correspond to the size of the party. *See Williams v. Rhodes, supra* 393

U.S. at 31, 89 S.Ct. at 10. The burdens are to be measured only against themselves and not in relation to the capacities of the parties. *Id.* The Court finds it impossible to say that the ballot access requirements of § 3001 and § 1749 impose greater burdens on small parties than major parties operate under in selecting candidates for the general election ballot, as required by State statutes. With respect to individuals, the desire of some of the plaintiffs to change their party designation during the prohibited period in order to exercise their right to vote effectively has been experienced just as severely by members of major parties wishing to switch to another major party. Any statute designed to prevent party raiding will to some extent deny legitimate political expression as well, but such is denied to all, not just to potential members of minor parties. Nor is the candidate of a major party *who must win the votes of a majority in a party primary in order to be placed on the ballot likely to shoulder a lesser burden than that of the minor party candidate. Jenness v. Fortson, supra* 403 U.S. at 440, 91 S.Ct. at 1975.

■ In summary, this Court holds that 15 Del.C. § 1749 does not unconstitutionally infringe plaintiffs' Fourteenth Amendment right to equal protection under the law, nor does it violate the plaintiffs' First Amendment rights to freedom of speech and association.[7] Therefore, plaintiffs' motion for summary judgment is denied.

## ON MOTION TO INTERVENE

A third party, Elizabeth Cole, has moved to intervene in this action pursuant to Rule 24(b) of the F.R.Civ.P., following the Court's denial of plaintiffs' motion for summary judgment on October 7, 1980.

■ Following *NAACP v. New York*, 413 U.S. 345, 93 S.Ct. 2591, 37 L.Ed.2d

---

**7.** During oral argument, the Court raised the question of the State's right to apply § 1749 to voters registered as "independent" or "decline." However, no affidavits as to this practice were submitted to the Court. Nor does it appear that the issue is critical to the outcome of this case. Assuming *arguendo* that voters *registered as independent or decline had the right to register as members of the Citizens* Party during the periods in which change of party designation is prohibited by § 1749, *see Storer v. Brown*, 415 U.S. 724, 741, 94 S.Ct. 1274, 1284, 39 L.Ed.2d 714 (1974), the Citizens Party still would not have qualified under § 3001. Only thirty rather than the necessary additional forty–one voters attested to the desire to register as Citizens Party members by August 15, 1980.

786

648 (1973), it is clear that this Court has considerable discretion in determining whether a motion to intervene has been timely made. A timeliness determination requires an evaluation of "all the circumstances," *id.* at 366, 93 S.Ct. at 2603, including such factors as the amount of time that has elapsed since the suit was initiated, whether and when the applicant knew of the suit, the interests of the applicant, whether the applicant seeks to relitigate issues previously decided, and the disruption of the orderly processes of the Court. *See* Note, The Timeliness Threat to Intervention of Right, 89 Yale L.J. 586, 593 n. 40 (1980). Upon examination of all the circumstances, the Court finds no reason to permit intervention at this time.

First, movant has no justification for intervening at this late date after judgment has been reached. The original complaint included an affidavit signed by the movant in August attesting to her interest in registering as a member of the Citizens Party and the refusal of the election officials to allow her to do so because she was registered as an independent. Though movant knew of the possibility of the suit at that time, she did not move to intervene until she was contacted by the plaintiffs after the Court's denial of the motion for summary judgment. Further, insofar as she is not an independently motivated third party, there is no justification for plaintiffs' failure to bring her in earlier.

Second, intervention would severely disturb the State's election process. The State waited until the Court reached its decision on the summary judgment motion to begin printing ballots. The process is now in motion, and any halt at this time may very well make the delivery and return of absentee ballots within the remaining time period impossible.

For the reasons stated, the motion to intervene is untimely, and it is denied.