STORER ᴇᴛ ᴀʟ. *v.* BROWN, SECRETARY OF
STATE OF CALIFORNIA, ᴇᴛ ᴀʟ.

No. 72–812.   Argued November 5, 1973—Decided March 26, 1974*

---

*Together with No. 72–6050, *Frommhagen* v. *Brown, Secretary of State of California, et al.,* also on appeal from the same court.

726

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which DOUGLAS and MARSHALL, JJ., joined, *post*, p. 755.

*Paul N. Halvonik* and *Joseph Remcho* argued the cause for appellants in both cases. With them on the brief for appellants in No. 72–812 was *Charles C. Marson.* Appellant *pro se* filed a brief in No. 72–6050.

*Clayton P. Roche,* Deputy Attorney General of California, argued the cause for appellee Brown in both cases. With him on the brief were *Evelle J. Younger,* Attorney General, and *Iver E. Skjeie,* Assistant Attorney General.†

MR. JUSTICE WHITE delivered the opinion of the Court.

The California Elections Code forbids ballot position to an independent candidate for elective public office if he voted in the immediately preceding primary, § 6830 (c) (Supp. 1974),[1] or if he had a registered affiliation with a qualified political party at any time within one year prior to the immediately preceding primary election. § 6830 (d) (Supp. 1974). The independent candidate must also file nomination papers signed by voters not less

---

†*Rolland R. O'Hare* filed a brief for the Committee for Democratic Election Laws as *amicus curiae* in No. 72–812.

[1] The relevant provisions of the California Elections Code are printed in the appendix to this opinion.

in number than 5% nor more than 6% of the entire vote cast in the preceding general election in the area for which the candidate seeks to run. § 6831 (1961). All of these signatures must be obtained during a 24-day period following the primary and ending 60 days prior to the general election, § 6833 (Supp. 1974), and none of the signatures may be gathered from persons who vote at the primary election. § 6830 (c) (Supp. 1974). The constitutionality of these provisions is challenged here as infringing on rights guaranteed by the First and Fourteenth Amendments and as adding qualifications for the office of United States Congressman, contrary to Art. I, § 2, cl. 2, of the Constitution.

Prior to the 1972 elections, appellants Storer, Frommhagen, Hall, and Tyner, along with certain of their supporters, filed their actions [2] to have the above sections of the Elections Code declared unconstitutional and their enforcement enjoined. Storer and Frommhagen each sought ballot status as an independent candidate for Congressman from his district.[3] Both complained about the party disaffiliation requirement of § 6830 (d) (Supp. 1974) and asserted that the combined effects of the provisions were unconstitutional burdens on their First and Fourteenth Amendment rights. Hall and Tyner claimed the right to ballot position as independent candidates for President and Vice President of the United States. They

---

[2] Storer's action, No. 72–812, was filed first. Frommhagen was allowed to intervene. Hall and Tyner later filed suit. In its opinion the District Court noted that "[b]y appropriate orders and stipulations, although the cases were never consolidated, the parties to *Hall* will be bound by the rulings made in *Storer* which are common to both cases and any separate issues in *Hall* stand submitted without further briefing or oral argument. The view taken by the Court herein is such that there are no separate issues in *Hall* and the rulings expressed are dispositive of both cases."

[3] Storer sought to be a candidate from the Sixth Congressional District, Frommhagen from the Twelfth.

were members of the Communist Party but that party had not qualified for ballot position in California. They, too, complained of the combined effect of the indicated sections of the Elections Code on their ability to achieve ballot position.

A three-judge District Court concluded that the statutes served a sufficiently important state interest to sustain their constitutionality and dismissed the complaints. Two separate appeals were taken from the judgment. We noted probable jurisdiction and consolidated the cases for oral argument. 410 U. S. 965 (1973).

## I

We affirm the judgment of the District Court insofar as it refused relief to Storer and Frommhagen with respect to the 1972 general election. Both men were registered Democrats until early in 1972, Storer until January and Frommhagen until March of that year. This affiliation with a qualified political party within a year prior to the 1972 primary disqualified both men under § 6830 (d) (Supp. 1974); and in our view the State of California was not prohibited by the United States Constitution from enforcing that provision against these men.

In *Williams* v. *Rhodes*, 393 U. S. 23 (1968), the Court held that although the citizens of a State are free to associate with one of the two major political parties, to participate in the nomination of their chosen party's candidates for public office and then to cast their ballots in the general election, the State must also provide feasible means for other political parties and other candidates to appear on the general election ballot. The Ohio law under examination in that case made no provision for independent candidates and the requirements for any but the two major parties qualifying for the ballot were so burdensome that it was "virtually impossible" for other parties, new or old, to achieve ballot position for their can-

didates. *Id.,* at 25. Because these restrictions, which were challenged under the Equal Protection Clause, severely burdened the right to associate for political purposes and the right to vote effectively, the Court, borrowing from other cases, ruled that the discriminations against new parties and their candidates had to be justified by compelling state interests. The Court recognized the substantial state interest in encouraging compromise and political stability, in attempting to ensure that the election winner will represent a majority of the community and in providing the electorate with an understandable ballot and inferred that "reasonable requirements for ballot position," *id.,* at 32, would be acceptable. But these important interests were deemed insufficient to warrant burdens so severe as to confer an effective political monopoly on the two major parties. The First and Fourteenth Amendments, including the Equal Protection Clause of the latter, required as much.

In challenging § 6830 (d) (Supp. 1974), appellants rely on *Williams* v. *Rhodes* and assert that under that case and subsequent cases dealing with exclusionary voting and candidate qualifications, *e. g., Dunn* v. *Blumstein,* 405 U. S. 330 (1972); *Bullock* v. *Carter,* 405 U. S. 134 (1972); *Kramer* v. *Union Free School District,* 395 U. S. 621 (1969), substantial burdens on the right to vote or to associate for political purposes are constitutionally suspect and invalid under the First and Fourteenth Amendments and under the Equal Protection Clause unless essential to serve a compelling state interest. These cases, however, do not necessarily condemn § 6830 (d) (Supp. 1974). It has never been suggested that the *Williams-Kramer-Dunn* rule automatically invalidates every substantial restriction on the right to vote or to associate. Nor could this be the case under our Constitution where the States are given the initial task of determining the

qualifications of voters who will elect members of Congress. Art. I, § 2, cl. 1. Also Art. I, § 4, cl. 1, authorizes the States to prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives." Moreover, as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes. In any event, the States have evolved comprehensive, and in many respects complex, election codes regulating in most substantial ways, with respect to both federal and state elections, the time, place, and manner of holding primary and general elections, the registration and qualifications of voters, and the selection and qualification of candidates.

It is very unlikely that all or even a large portion of the state election laws would fail to pass muster under our cases; and the rule fashioned by the Court to pass on constitutional challenges to specific provisions of election laws provides no litmus-paper test for separating those restrictions that are valid from those that are invidious under the Equal Protection Clause. The rule is not self-executing and is no substitute for the hard judgments that must be made. Decision in this context, as in others, is very much a "matter of degree," *Dunn* v. *Blumstein, supra,* at 348, very much a matter of "consider[ing] the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification." *Williams* v. *Rhodes, supra,* at 30; *Dunn* v. *Blumstein, supra,* at 335. What the result of this process will be in any specific case may be very difficult to predict with great assurance.

The judgment in *Dunn* v. *Blumstein* invalidated the Tennessee one-year residence requirement for voting but agreed that the State's interest was obviously sufficient

to limit voting to residents, to require registration for voting, and to close the registration books at some point prior to the election, a deadline which every resident must meet if he is to cast his vote at the polls. Subsequently, three-judge district courts differed over the validity of a requirement that voters be registered for 50 days prior to election. This Court, although divided, sustained the provision. *Burns* v. *Fortson,* 410 U. S. 686 (1973); *Marston* v. *Lewis,* 410 U. S. 679 (1973).

*Rosario* v. *Rockefeller,* 410 U. S. 752 (1973), is more relevant to the problem before us. That case dealt with a provision that to vote in a party primary the voter must have registered as a party member 30 days prior to the previous general election, a date eight months prior to the presidential primary and 11 months prior to the nonpresidential primary. Those failing to meet this deadline, with some exceptions, were barred from voting at either primary. We sustained the provision as "in no sense invidious or arbitrary," because it was "tied to [the] particularized legitimate purpose," *id.,* at 762, of preventing interparty raiding, a matter which bore on "the integrity of the electoral process." *Id.,* at 761.

Later the Court struck down similar Illinois provisions aimed at the same evil, where the deadline for changing party registration was 23 months prior to the primary date. *Kusper* v. *Pontikes,* 414 U. S. 51 (1973). One consequence was that a voter wishing to change parties could not vote in any primary that occurred during the waiting period. The Court did not retreat from *Rosario* or question the recognition in that case of the States' strong interest in maintaining the integrity of the political process by preventing interparty raiding. Although the 11-month requirement imposed in New York had been accepted as necessary for an effective remedy, the Court was unconvinced that the 23-month period estab-

lished in Illinois was an essential instrument to counter the evil at which it was aimed.

Other variables must be considered where qualifications for candidates rather than for voters are at issue. In *Jenness* v. *Fortson,* 403 U. S. 431 (1971), we upheld a requirement that independent candidates must demonstrate substantial support in the community by securing supporting signatures amounting to 5% of the total registered voters in the last election for filling the office sought by the candidate. The Court said:

> "There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot— the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election." *Id.,* at 442.

Subsequently, in *Bullock* v. *Carter,* 405 U. S., at 145, a unanimous Court said:

> "The Court has recognized that a State has a legitimate interest in regulating the number of candidates on the ballot. *Jenness* v. *Fortson,* 403 U. S., at 442; *Williams* v. *Rhodes,* 393 U. S., at 32. In so doing, the State understandably and properly seeks to prevent the clogging of its election machinery, avoid voter confusion, and assure that the winner is the choice of a majority, or at least a strong plurality, of those voting, without the expense and burden of runoff elections. Although we have no way of gauging the number of candidates who might enter primaries in Texas if access to the ballot were unimpeded by the large filing fees in question here, we are bound to respect the legitimate objectives of the State in avoiding overcrowded bal-

lots. Moreover, a State has an interest, if not a duty, to protect the integrity of its political processes from frivolous or fraudulent candidacies. *Jenness* v. *Fortson,* 403 U. S., at 442."

Against this pattern of decisions we have no hesitation in sustaining § 6830 (d) (Supp. 1974). In California, the independent candidacy route to obtaining ballot position is but a part of the candidate-nominating process, an alternative to being nominated in one of the direct party primaries. The independent candidate need not stand for primary election but must qualify for the ballot by demonstrating substantial public support in another way. Otherwise, the qualifications required of the independent candidate are very similar to, or identical with, those imposed on party candidates. Section 6401 (Supp. 1974) imposes a flat disqualification upon any candidate seeking to run in a party primary if he has been "registered as affiliated with a political party other than that political party the nomination of which he seeks within 12 months immediately prior to the filing of the declaration." Moreover, §§ 6402 and 6611 provide that a candidate who has been defeated in a party primary may not be nominated as an independent or be a candidate of any other party; and no person may file nomination papers for a party nomination and an independent nomination for the same office, or for more than one office at the same election.

The requirement that the independent candidate not have been affiliated with a political party for a year before the primary is expressive of a general state policy aimed at maintaining the integrity of the various routes to the ballot. It involves no discrimination against independents. Indeed, the independent candidate must be clear of political party affiliations for a year before the primary; the party candidate must not have been registered with another party for a year before he files

his declaration, which must be done not less than 83 and not more than 113 days prior to the primary. § 6490 (Supp. 1974).

In *Rosario* v. *Rockefeller,* there was an 11-month waiting period for voters who wanted to change parties. Here, a person terminating his affiliation with a political party must wait at least 12 months before he can become a candidate in another party's primary or an independent candidate for public office. The State's interests recognized in *Rosario* are very similar to those that undergird the California waiting period; and the extent of the restriction is not significantly different. It is true that a California candidate who desires to run for office as an independent must anticipate his candidacy substantially in advance of his election campaign, but the required foresight is little more than the possible 11 months examined in *Rosario,* and its direct impact is on the candidate, and not voters. In any event, neither Storer nor Frommhagen is in position to complain that the waiting period is one year, for each of them was affiliated with a qualified party no more than six months prior to the primary. As applied to them, § 6830 (d) (Supp. 1974) is valid.

After long experience, California came to the direct party primary as a desirable way of nominating candidates for public office. It has also carefully determined which public offices will be subject to partisan primaries and those that call for nonpartisan elections.[4] Moreover, after long experience with permitting candidates to run in the primaries of more than one party, California forbade the cross-filing practice in 1959.[5] A candidate in

---

[4] The California Elections Code § 41 provides that judicial, school, county, and municipal offices are nonpartisan offices for which no party may nominate a candidate.

[5] See Gaylord, History of the California Election Laws 59, contained in West's Ann. Elec. Code (1961), preceding §§ 1–11499.

one party primary may not now run in that of another; if he loses in the primary, he may not run as an independent; and he must not have been associated with another political party for a year prior to the primary. See §§ 6401, 6611. The direct party primary in California is not merely an exercise or warm-up for the general election but an integral part of the entire election process,[6] the initial stage in a two-stage process by which the people choose their public officers. It functions to winnow out and finally reject all but the chosen candidates. The State's general policy is to have contending forces within the party employ the primary campaign and primary election to finally settle their differences. The general election ballot is reserved for major struggles; it is not a forum for continuing intraparty feuds. The provision against defeated primary candidates running as independents effectuates this aim, the visible result being to prevent the losers from continuing the struggle and to limit the names on the ballot to those who have won the primaries and those independents who have properly qualified. The people, it is hoped, are presented with understandable choices and the winner in the general election with sufficient support to govern effectively.

Section 6830 (d) (Supp. 1974) carries very similar credentials. It protects the direct primary process by refusing to recognize independent candidates who do not make early plans to leave a party and take the alternative course to the ballot. It works against independent candidacies prompted by short-range political goals, pique, or personal quarrel. It is also a substantial barrier to a party fielding an "independent" candidate to capture and bleed off votes in the general election that might well go to another party.

---

[6] See *In re McGee*, 36 Cal. 2d 592, 226 P. 2d 1 (1951).

A State need not take the course California has, but California apparently believes with the Founding Fathers that splintered parties and unrestrained factionalism may do significant damage to the fabric of government. See The Federalist, No. 10 (Madison). It appears obvious to us that the one-year disaffiliation provision furthers the State's interest in the stability of its political system. We also consider that interest as not only permissible, but compelling and as outweighing the interest the candidate and his supporters may have in making a late rather than an early decision to seek independent ballot status. Nor do we have reason for concluding that the device California chose, § 6830 (d) (Supp. 1974), was not an essential part of its overall mechanism to achieve its acceptable goals. As we indicated in *Rosario,* the Constitution does not require the State to choose ineffectual means to achieve its aims. To conclude otherwise might sacrifice the political stability of the system of the State, with profound consequences for the entire citizenry, merely in the interest of particular candidates and their supporters having instantaneous access to the ballot.

We conclude that § 6830 (d) (Supp. 1974) is not unconstitutional, and Storer and Frommhagen were properly barred from the ballot as a result of its application.[7] Cf. *Lippitt* v. *Cipollone,* 404 U. S. 1032 (1972). Having reached this result, there is no need to examine the constitutionality of the other provisions of the Elections Code as they operate singly or in combination as applied to these candidates. Even if these statutes were wholly or partly unconstitutional, Storer and Frommhagen were still properly barred from having their names placed on

---

[7] Moreover, we note that the independent candidate who cannot qualify for the ballot may nevertheless resort to the write-in alternative provided by California law, see §§ 18600–18603 (Supp. 1974).

the 1972 ballot. Although *Williams* v. *Rhodes*, 393 U. S., at 34, spoke in terms of assessing the "totality" of the election laws as they affected constitutional rights, if a candidate is absolutely and validly barred from the ballot by one provision of the laws, he cannot challenge other provisions as applied to other candidates. The concept of "totality" is applicable only in the sense that a number of facially valid provisions of election laws may operate in tandem to produce impermissible barriers to constitutional rights. The disaffiliation requirement does not change its character when combined with other provisions of the electoral code. It is an absolute bar to candidacy, and a valid one. The District Court need not have heard a challenge to these other provisions of the California Elections Code by one who did not satisfy the age requirement for becoming a member of Congress, and there was no more reason to consider them at the request of Storer and Frommhagen or at the request of voters who desire to support unqualified candidates.[8]

---

[8] The 1972 election is long over, and no effective relief can be provided to the candidates or voters, but this case is not moot, since the issues properly presented, and their effects on independent candidacies, will persist as the California statutes are applied in future elections. This is, therefore, a case where the controversy is "capable of repetition, yet evading review." *Rosario* v. *Rockefeller*, 410 U. S. 752, 756 n. 5 (1973); *Dunn* v. *Blumstein*, 405 U. S. 330, 333 n. 2 (1972); *Moore* v. *Ogilvie*, 394 U. S. 814, 816 (1969); *Southern Pacific Terminal Co.* v. *ICC*, 219 U. S. 498, 515 (1911). The "capable of repetition, yet evading review" doctrine, in the context of election cases, is appropriate when there are "as applied" challenges as well as in the more typical case involving only facial attacks. The construction of the statute, an understanding of its operation, and possible constitutional limits on its application, will have the effect of simplifying future challenges, thus increasing the likelihood that timely filed cases can be adjudicated before an election is held.

## II

We come to different conclusions with respect to Hall and Tyner.[9] As to these two men we vacate the judgment of the District Court and remand the case for further proceedings to determine whether the California election laws place an unconstitutional burden on their access to the ballot.

We start with the proposition that the requirements for an independent's attaining a place on the general election ballot can be unconstitutionally severe, *Williams* v. *Rhodes, supra.* We must, therefore, inquire as to the nature, extent, and likely impact of the California requirements.

Beyond the one-year party disaffiliation condition and the rule against voting in the primary, both of which Hall apparently satisfied, it was necessary for an independent candidate to file a petition signed by voters not less in number than 5% of the total votes cast in California at the last general election. This percentage, as such, does not appear to be excessive, see *Jenness* v. *Fortson, supra,* but to assess realistically whether the law imposes excessively burdensome requirements upon independent candidates it is necessary to know other critical facts which do not appear from the evidentiary record in this case.

---

[9] In California, presidential electors must meet candidacy requirements and file their nomination papers with the required signatures. §§ 6803, 6830. The State claims, therefore, that the electors, not Hall and Tyner, are the only persons with standing to raise the validity of the signature requirements. But it is Hall's and Tyner's names that go on the California ballot for consideration of the voters. § 6804. Without the necessary signatures this will not occur. It is apparent, contrary to the State's suggestion, that Hall and Tyner have ample standing to challenge the signature requirement.

Hereafter, in the text and notes, reference to Hall should be understood as referring also to Tyner.

It is necessary in the first instance to know the "entire vote" in the last general election. Appellees suggest that 5% of that figure, whatever that is, is 325,000. Assuming this to be the correct total signature requirement, we also know that it must be satisfied within a period of 24 days between the primary and the general election. But we do not know the number of qualified voters from which the requirement must be satisfied within this period of time. California law disqualifies from signing the independent's petition all registered voters who voted in the primary. In theory, it could be that voting in the primary was so close to 100% of those registered, and new registrations since closing the books before primary day were so low, that eligible signers of an unaffiliated candidate's petition would number less than the total signatures required. This is unlikely, for it is usual that a substantial percentage of those eligible do not vote in the primary, and there were undoubtedly millions of voters qualified to vote in the 1972 primary. But it is not at all unlikely that the available pool of possible signers, after eliminating the total primary vote, will be substantially smaller than the total vote in the last general election and that it will require substantially more than 5% of the eligible pool to produce the necessary 325,000 signatures. This would be in excess, percentagewise, of anything the Court has approved to date as a precondition to an independent's securing a place on the ballot and in excess of the 5% which we said in *Jenness* was higher than the requirement imposed by most state election codes.[10]

---

[10] See also *Auerbach* v. *Mandel,* 409 U. S. 808 (1972) (3%); *Wood* v. *Putterman,* 316 F. Supp. 646 (Md. 1970) (three-judge court), aff'd mem., 400 U. S. 859 (1970) (3%); and *Beller* v. *Kirk,* 328 F. Supp. 485 (SD Fla. 1970) (three-judge court), aff'd mem. *sub nom. Beller* v. *Askew,* 403 U. S. 925 (1971) (3%). We note that

We are quite sure, therefore, that further proceedings should be had in the District Court to permit further findings with respect to the extent of the burden imposed on independent candidates for President and Vice President under California law. Standing alone, gathering 325,000 signatures in 24 days would not appear to be an impossible burden. Signatures at the rate of 13,542 per day would be required, but 1,000 canvassers could perform the task if each gathered 14 signers a day. On its face, the statute would not appear to require an impractical undertaking for one who desires to be a candidate for President. But it is a substantial requirement; and if the additional likelihood is, as it seems to us to be, that the total signatures required will amount to a substantially higher percentage of the available pool than the 5% stipulated in the statute, the constitutional claim asserted by Hall is not frivolous. Before the claim is finally dismissed, it should be determined whether the available pool is so diminished in size by the disqualification of those who voted in the primary that the 325,000-signature requirement, to be satisfied in 24 days, is too great a burden on the independent candidates for the offices of President and Vice President.

Because further proceedings are required, we must resolve certain issues that are in dispute in order that the ground rules for the additional factfinding in the District Court will more clearly appear. First, we have no doubt about the validity of disqualifying from signing an independent candidate's petition all those registered voters who voted a partisan ballot in the primary, although they did not vote for the office sought by the

---

in *Socialist Labor Party* v. *Rhodes,* 318 F. Supp. 1262 (SD Ohio 1970) (three-judge court), the District Court struck down a 7% petition requirement. That issue became moot on appeal, *Socialist Labor Party* v. *Gilligan,* 406 U. S. 583, 585 (1972).

independent. We have considered this matter at greater length in *American Party of Texas* v. *White,* see *post,* at 785–786, and we merely repeat here that a State may confine each voter to one vote in one primary election, and that to maintain the integrity of the nominating process the State is warranted in limiting the voter to participating in but one of the two alternative procedures, the partisan or the nonpartisan, for nominating candidates for the general election ballot.

Second, the District Court apparently had little doubt that the California law disqualified anyone voting in the primary election, whether or not he confined his vote to nonpartisan offices and propositions.[11] The State of California asserts this to be an erroneous interpretation of California law and claims that the District Court should have abstained to permit the California courts to address the question. In any event, the State does not attempt to justify disqualifying as signers of an independent's petition those who voted only a nonpartisan ballot at the primary, such as independent voters who themselves were disqualified from voting a partisan ballot. See § 311 (Supp. 1974). With what we have before us, it would be difficult to ascertain any rational ground, let alone a compelling interest, for disqualifying nonpartisan voters at the primary from signing an independent candidate's petition, and we think the District Court should reconsider the matter in the light of tentative views expressed here. Under the controlling cases, the District Court may, if it is so advised, abstain and permit the California courts to construe the California statute. On the other hand, it may be that adding to

[11] Two ballots are authorized in California primaries, the one for partisan office and the other for nonpartisan offices and propositions. See §§ 10014, 10232, 10318. A voter may take only the nonpartisan ballot and refrain from voting on partisan candidates.

the qualified pool of signers all those nonpartisan voters at the primary may make so little difference in the ultimate assessment of the overall burden of the signature requirement that the status of the nonpartisan voter is in fact an insignificant consideration not meriting abstention.[12]

Third, once the number of signatures required in the 24-day period is ascertained, along with the total pool from which they may be drawn, there will arise the inevitable question for judgment: in the context of California politics, could a reasonably diligent independent candidate be expected to satisfy the signature requirements, or will it be only rarely that the unaffiliated candidate will succeed in getting on the ballot? Past experience will be a helpful, if not always an unerring, guide: it will be one thing if independent candidates have qualified with some regularity and quite a different matter if they have not. We note here that the State mentions only one instance of an independent candidate's qualifying for any office under § 6430, but disclaims having made any comprehensive survey of the official records that would perhaps reveal the truth of the matter. One of the difficulties will be that the number of signatures required will vary with the total vote in the last election;

---

[12] From the official published voting statistics published by the California Secretary of State, it would appear that the total vote in the 1972 primaries, seemingly the total number of persons voting, was 6,460,220, while the total vote for partisan presidential candidates was 5,880,845. Thus all but approximately 579,000 voted for a partisan candidate in the presidential primary and it is likely that many of the 579,000 not voting for President cast a partisan ballot for other candidates. But assuming that they did not, the maximum addition to the pool available to Hall would be 579,000, probably a relatively small difference in terms of the total number of eligible signers. See Secretary of State, Statement of Vote, State of California, Consolidated Primary Election, June 6, 1972, pp. 3, 4–23.

the total disqualifying vote at the primary election and hence the size of the eligible pool of possible signers will also vary from election to election. Also to be considered is the relationship between the showing of support through a petition requirement and the percentage of the vote the State can reasonably expect of a candidate who achieves ballot status in the general election.

As a preliminary matter, it would appear that the State, having disqualified defeated candidates and recent defectors, has in large part achieved its major purpose of providing and protecting an effective direct primary system and must justify its independent signature requirements chiefly by its interest in having candidates demonstrate substantial support in the community so that the ballot, in turn, may be protected from frivolous candidacies and kept within limits understandable to the voter. If the required signatures approach 10% of the eligible pool of voters, is it necessary to serve the State's compelling interest in a manageable ballot to require that the task of signature gathering be crowded into 24 days? [13] Of course, the petition period must end at a reasonable time before election day to permit nomination papers to be verified. Neither must California abandon its policy of confining each voter to a single nominating act—either voting in the partisan primary or a signature on an independent petition. But the question remains whether signature gathering must

[13] Appellees argue only that the independent candidate's canvassing for signatures should await the announcement of the primary winners and the promulgation of party platforms so that the voters eligible to sign, i. e., those not voting in the primary, will have a meaningful choice between the primary nominations and the independents. This does not appear to be a matter particularly relevant to signing petitions for ballot position, for the meaningful choice referred to by appellees will be finally presented at the general election.

await conclusion of the primary. It would not appear untenable to permit solicitation of signatures to begin before primary day and finish afterwards. Those signing before the primary could either be definitely disqualified from a partisan vote in the primary election or have the privilege of canceling their petition signatures by the act of casting a ballot in the primary election. And if these alternatives are unacceptable, there would remain the question whether it is essential to demonstrate community support to gather signatures of substantially more than 5% of the group from which the independent is permitted to solicit support.[14]

Appellees insist, however, that the signature requirements for independent candidates are of no consequence because California has provided a valid way for new political parties to qualify for ballot position, an alternative that Hall could have pursued, but did not. Under § 6430, new political parties can be recognized and qualify their candidate for ballot position if 135 days before a primary election it appears that voters equal in number to at least 1% of the entire vote of the State at the last preceding gubernatorial election have declared to the

---

[14] It may help to put this case in proper context to hypothesize the scope of Hall's petition and signature burden under the California law by employing the election statistics available from official sources in California. Assuming that the "entire vote" in the last general election was the total number of persons voting in the 1970 election, 6,633,400, 5% of that figure, or the total number of signatures required, is 331,670. See Secretary of State, Statement of Vote, General Election, November 7, 1972, p. 6. The total registration for the 1972 primary was 9,105,287. See 1972 Primary Vote, p. 3. Adding to this figure an estimate of the increase in registration since the primary date and subtracting the minimum partisan vote at the primary election, the available pool of possible signers, by this calculation, would be 4,072,279, see Secretary of State, Report of Registration, September 1972, p. 8, of which the required 331,670 signatures was 8.1%.

county clerks their intention to affiliate with the new party, or if, by the same time, the new party files a petition with signatures equal in number to 10% of the last gubernatorial vote.[15] It is argued that the 1% registration requirement is feasible, has recently been resorted to successfully by two new political parties now qualified for the California ballot, and goes as far as California constitutionally must go in providing an alternative to the direct party primary of the major parties.

It may be that the 1% registration requirement is a valid condition to extending ballot position to a new political party. Cf. *American Party of Texas* v. *White, post,* p. 767. But the political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other. A new party organization contemplates a statewide, ongoing organization with distinctive political character. Its goal is typically to gain control of the machinery of state government by electing its candidates to public office. From the standpoint of a potential supporter, affiliation with the new party would mean giving up his ties with another party or sacrificing his own independent status, even though his possible interest in the new party centers around a particular candidate for a particular office. For the candidate himself, it would mean undertaking the serious responsibilities of qualified party status under California law, such as the conduct of a primary, holding party conventions, and the promulgation of party platforms. But more fundamentally, the candidate, who is by definition an independent and desires to remain one, must now consider himself a party man,

---

[15] The 1% registration requirement contemplates independent voters registering as affiliated with the party. The 10%-signature requirement, on the other hand, need not involve signers changing their registration.

surrendering his independent status. Must he necessarily choose the political party route if he wants to appear on the ballot in the general election? We think not.

In *Williams* v. *Rhodes,* the opportunity for political activity within either of two major political parties was seemingly available to all. But this Court held that to comply with the First and Fourteenth Amendments the State must provide a feasible opportunity for new political organizations and their candidates to appear on the ballot. No discernible state interest justified the burdensome and complicated regulations that in effect made impractical any alternative to the major parties. Similarly, here, we perceive no sufficient state interest in conditioning ballot position for an independent candidate on his forming a new political party as long as the State is free to assure itself that the candidate is a serious contender, truly independent, and with a satisfactory level of community support.[16]

Accordingly, we vacate the judgment in No. 72–812 insofar as it refused relief to Hall and Tyner and remand the case in this respect to the District Court for further proceedings consistent with this opinion. In all other respects, the judgment in No. 72–812 and No. 72–6050 is affirmed.

*So ordered.*

---

[16] Appellants also contend that § 6830 (d) (Supp. 1974) purports to establish an additional qualification for office of Representative and is invalid under Art. I, § 2, cl. 2, of the Constitution. The argument is wholly without merit. Storer and Frommhagen would not have been disqualified had they been nominated at a party primary or by an adequately supported independent petition and then elected at the general election. The non-affiliation requirement no more establishes an additional requirement for the office of Representative than the requirement that the candidate win the primary to secure a place on the general ballot or otherwise demonstrate substantial community support.

APPENDIX TO OPINION OF THE COURT

California Elections Code

§ 41. "Nonpartisan office"

"Nonpartisan office" means an office for which no party may nominate a candidate. Judicial, school, county, and municipal offices are nonpartisan offices.

§ 311 [Supp. 1974]. Declaration of political affiliation; voting at primary elections

At the time of registering and of transferring registration, each elector may declare the name of the political party with which he intends to affiliate at the ensuing primary election. The name of that political party shall be stated in the affidavit of registration and the index.

If the elector declines to state his political affiliation, he shall be registered as "Nonpartisan" or "Declines to state," as he chooses. If the elector declines to state his political affiliation, he shall be informed that no person shall be entitled to vote the ballot of any political party at any primary election unless he has stated the name of the party with which he intends to affiliate at the time of registration. He shall not be permitted to vote the ballot of any party or for delegates to the convention of any party other than the party designated in his registration.

§ 2500. General election

There shall be held throughout the State, on the first Tuesday after the first Monday of November in every even-numbered year, an election, to be known as the general election.

§ 2501. Direct primary

For the nomination of all candidates to be voted for at the general election, a direct primary shall be held at

748

the legally designated polling places in each precinct on the first Tuesday after the first Monday in the immediately preceding June.

§ 2502. Primary elections

Any primary election other than the direct primary or presidential primary shall be held on Tuesday, three weeks next preceding the election for which the primary election is held.

§ 6401 [Supp. 1974]. Party affiliation

No declaration of candidacy for a partisan office or for membership on a county central committee shall be filed, either by the candidate himself or by sponsors on his behalf, (1) unless at the time of presentation of the declaration and continuously for not less than three months immediately prior to that time, or for as long as he has been eligible to register to vote in the state, the candidate is shown by his affidavit of registration to be affiliated with the political party the nomination of which he seeks, and (2) the candidate has not been registered as affiliated with a political party other than that political party the nomination of which he seeks within 12 months immediately prior to the filing of the declaration.

The county clerk shall attach a certificate to the declaration of candidacy showing the date on which the candidate registered as intending to affiliate with the political party the nomination of which he seeks, and indicating that the candidate has not been affiliated with any other political party for the 12-month period immediately preceding the filing of the declaration.

§ 6402. Independent nominees

This chapter does not prohibit the independent nomination of candidates under the provisions of Chapter 3

(commencing at Section 6800) of this division, subject to the following limitations:

(a) A candidate whose name has been on the ballot as a candidate of a party at the direct primary and who has been defeated for that party nomination is ineligible for nomination as an independent candidate. He is also ineligible as a candidate named by a party central committee to fill a vacancy on the ballot for a general election.

(b) No person may file nomination papers for a party nomination and an independent nomination for the same office, or for more than one office at the same election.

§ 6430. Qualified parties

A party is qualified to participate in any primary election:

(a) If at the last preceding gubernatorial election there was polled for any one of its candidates who was the candidate of that party only for any office voted on throughout the State, at least 2 percent of the entire vote of the State; or

(b) If at the last preceding gubernatorial election there was polled for any one of its candidates who, upon the date of that election, as shown by the affidavits of registration of voters in the county of his residence, was affiliated with that party and was the joint candidate of that party and any other party for any office voted on throughout the State, at least 6 percent of the entire vote of the State; or

(c) If on or before the 135th day before any primary election, it appears to the Secretary of State, as a result of examining and totaling the statement of voters and their political affiliations transmitted to him by the county clerks, that voters equal in number to at least 1 percent of the entire vote of the State at the last preceding gubernatorial election have declared their intention to affiliate with that party; or

(d) If on or before the 135th day before any primary election, there is filed with the Secretary of State a petition signed by voters, equal in number to at least 10 percent of the entire vote of the State at the last preceding gubernatorial election, declaring that they represent a proposed party, the name of which shall be stated in the petition, which proposed party those voters desire to have participate in that primary election. This petition shall be circulated, signed, verified and the signatures of the voters on it shall be certified to and transmitted to the Secretary of State by the county clerks substantially as provided for initiative petitions. Each page of the petition shall bear a caption in 18-point blackface type, which caption shall be the name of the proposed party followed by the words "Petition to participate in the primary election." No voters or organization of voters shall assume a party name or designation which is so similar to the name of an existing party as to mislead voters.

Whenever the registration of any party which qualified in the previous direct primary election falls below one-fifteenth of 1 percent of the total state registration, that party shall not be qualified to participate in the primary election but shall be deemed to have been abandoned by the voters, since the expense of printing ballots and holding a primary election would be an unjustifiable expense and burden to the State for so small a group. The Secretary of State shall immediately remove the name of the party from any list, notice, ballot, or other publication containing the names of the parties qualified to participate in the primary election.

§ 6490 [Supp. 1974]. Declaration of candidacy

No candidate's name shall be printed on the ballot to be used at a direct primary unless a declaration of his

candidacy is filed not less than 83 and not more than 113 days prior to the direct primary.

The declaration may be made by the candidate or by sponsors on his behalf.

When the declaration is made by sponsors the candidate's affidavit of acceptance shall be filed with the declaration.

§ 6611. Unsuccessful candidate; ineligibility as candidate of another party

A candidate who fails to receive the highest number of votes for the nomination of the political party with which he was registered as affiliated on the date his declaration of candidacy or declaration of acceptance of nomination was filed with the county clerk cannot be the candidate of any other political party.

§ 6803. Group of candidates for presidential electors; designation of presidential and vice presidential candidates

Whenever a group of candidates for presidential electors, equal in number to the number of presidential electors to which this State is entitled, files a nomination paper with the Secretary of State pursuant to this chapter, the nomination paper may contain the name of the candidate for President of the United States and the name of the candidate for Vice President of the United States for whom all of those candidates for presidential electors pledge themselves to vote.

§ 6804. Printing of names on ballot

When a group of candidates for presidential electors designates the presidential and vice presidential candidates for whom all of the group pledge themselves to vote, the names of the presidential candidate and vice presidential candidate designated by that group shall be printed on the ballot.

§ 6830 [Supp. 1974].   Contents

Each candidate or group of candidates shall file a nomination paper which shall contain:

(a) The name and residence address of each candidate, including the name of the county in which he resides.

(b) A designation of the office for which the candidate or group seeks nomination.

(c) A statement that the candidate and each signer of his nomination paper did not vote at the immediately preceding primary election at which a candidate was nominated for the office mentioned in the nomination paper.   The statement required in this subdivision shall be omitted when no candidate was nominated for the office at the preceding primary election.

(d) A statement that the candidate is not, and was not at any time during the one year preceding the immediately preceding primary election at which a candidate was nominated for the office mentioned in the nomination paper, registered as affiliated with a political party qualified under the provisions of Section 6430. The statement required by this subdivision shall be omitted when no primary election was held to nominate candidates for the office to which the independent nomination paper is directed.

§ 6831.   Signatures required

Nomination papers shall be signed by voters of the area for which the candidate is to be nominated, not less in number than 5 percent nor more than 6 percent of the entire vote cast in the area at the preceding general election.   Nomination papers for Representative in Congress, State Senator or Assemblyman, to be voted for at a special election to fill a vacancy, shall be signed by voters in the district not less in number than 500 or 1 percent of the entire vote cast in the area at the pre-

ceding general election, whichever is less, nor more than 1,000.

§ 6833 [Supp. 1974]. Time for filing, circulation and signing; verification

Nomination papers required to be filed with the Secretary of State or with the county clerk shall be filed not more than 79 nor less than 54 days before the day of the election, but shall be prepared, circulated, signed, verified and left with the county clerk for examination, or for examination and filing, no earlier than 84 days before the, election and no later than 5 p. m. 60 days before the election. If the total number of signatures submitted to a county clerk for an office entirely within that county does not equal the number of signatures needed to qualify the candidate, the county clerk shall declare the petition void and is not required to verify the signatures. If the district falls within two or more counties, the county clerk shall within two working days report in writing to the Secretary of State the total number of signatures filed. If the Secretary of State finds that the total number of signatures filed in the district or state is less than the minimum number required to qualify the candidate he shall within one working day notify in writing the counties involved that they need not verify the signatures.

§ 10014. Ballots for voters at primary elections

At a primary election only a nonpartisan ballot shall be furnished to each voter who is not registered as intending to affiliate with any one of the political parties participating in the primary election; and to any voter registered as intending to affiliate with a political party participating in a primary election, there shall be furnished only a ballot of the political party with which he is registered as intending to affiliate.

## § 10232. Inconveniently large ballots

If the election board of a county determines that due to the number of candidates and measures that must be printed on the general election ballot, the ballot will be larger than may be conveniently handled, the board may order nonpartisan offices and local measures omitted from the general election ballot and printed on a separate ballot in a form substantially the same as provided for the general election ballot. If the board so orders, each voter shall receive both ballots, and the procedure prescribed for the handling and canvassing of ballots shall be modified to the extent necessary to permit the use of two ballots by a voter. The board may, in such case, order the second ballot to be printed on paper of a different tint and assign to those ballots numbers higher than those assigned to the ballots containing partisan offices and statewide ballot measures.

## § 10318. Inconveniently large ballots

If the election board of a county determines that due to the number of candidates and measures that must be printed on the direct primary ballot the ballot will be larger than may be conveniently handled, the board may provide that a nonpartisan ballot shall be given to each partisan voter, together with his partisan ballot, and that the material appearing under the heading "Nonpartisan Offices" on partisan ballots, as well as the heading itself, shall be omitted from the partisan ballots. If the board so provides, the procedure prescribed for the handling and canvassing of ballots shall be modified to the extent necessary to permit the use of two ballots by partisan voters.

## § 18600 [Supp. 1974]. Write-in votes

Any name written upon a ballot shall be counted, unless prohibited by Section 18603, for that name for the

office under which it is written, if it is written in the blank space therefor, whether or not a cross (+) is stamped or made with pen or pencil in the voting square after the name so written.

§ 18601 [Supp. 1974]. Declaration required

Every person who desires to have his name as written on the ballots of an election counted for a particular office shall file a declaration stating that he is a write-in candidate for the nomination for or election to the particular office and giving the title of that office.

§ 18602 [Supp. 1974]. Declaration; filing

The declaration required by Section 18601 shall be filed no later than the eighth day prior to the election to which it applies. It shall be filed with the clerks, registrar of voters, or district secretary responsible for the conduct of the election in which the candidate desires to have write-in votes of his name counted.

§ 18603 [Supp. 1974]. Requirements for tabulation of write-in vote

No name written upon a ballot in any state, county, city, city and county, or district election shall be counted for an office or nomination unless

(a) A declaration has been filed pursuant to Sections 18601 and 18602 declaring a write-in candidacy for that particular person for that particular office or nomination and

(b) The fee required by Section 6555 is paid when the declaration of write-in candidacy is filed pursuant to Section 18602.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE MARSHALL concur, dissenting.

The Court's opinion in these cases, and that in *American Party of Texas* v. *White, post,* p. 767, hold—correctly

in my view—that the test of the validity of state legisla-
tion regulating candidate access to the ballot is whether
we can conclude that the legislation, strictly scrutinized,
is necessary to further compelling state interests. See
*ante,* at 736; *American Party of Texas* v. *White, post,* at
780–781; for, as we recognized in *Williams* v. *Rhodes,* 393
U. S. 23, 30 (1968), such state laws "place burdens on
two different, although overlapping, kinds of rights—the
right of individuals to associate for the advancement of
political beliefs, and the right of qualified voters, regard-
less of their political persuasion, to cast their votes effec-
tively." The right to vote derives from the right of
association that is at the core of the First Amendment,
protected from state infringement by the Fourteenth
Amendment. *NAACP* v. *Button,* 371 U. S. 415, 430
(1963); *Bates* v. *Little Rock,* 361 U. S. 516, 522–523
(1960); *NAACP* v. *Alabama,* 357 U. S. 449, 460–461
(1958). Indeed, the right to vote is "a fundamental
political right, because preservative of all rights," *Yick
Wo* v. *Hopkins,* 118 U. S. 356, 370 (1886), and "[o]ther
rights, even the most basic, are illusory if the right to
vote is undermined," *Wesberry* v. *Sanders,* 376 U. S. 1,
17 (1964). See also *Reynolds* v. *Sims,* 377 U. S. 533, 555
(1964). Thus, when legislation burdens such a funda-
mental constitutional right, it is not enough that the
legislative means rationally promote legitimate govern-
mental ends. Rather,

> "governmental action may withstand constitutional
> scrutiny only upon a clear showing that the burden
> imposed is necessary to protect a compelling and
> substantial governmental interest. *Shapiro* v.
> *Thompson,* 394 U. S. [618, 634 (1969)]; *United
> States* v. *Jackson,* 390 U. S. 570, 582–583 (1968);
> *Sherbert* v. *Verner,* 374 U. S. 398, 406–409 (1963).
> And once it be determined that a burden has been

placed upon a constitutional right, the onus of demonstrating that no less intrusive means will adequately protect compelling state interests is upon the party seeking to justify the burden. See *Speiser* v. *Randall,* 357 U. S. 513, 525–526 (1958)." *Oregon* v. *Mitchell,* 400 U. S. 112, 238 (1970) (separate opinion of BRENNAN, WHITE, and MARSHALL, JJ.).

See also *Dunn* v. *Blumstein,* 405 U. S. 330, 336–337 (1972); *Kramer* v. *Union Free School District,* 395 U. S. 621, 627 (1969); *Williams* v. *Rhodes,* 393 U. S., at 31.

I have joined the Court's opinion in *American Party of Texas* v. *White, supra,*[1] because I agree that, although the conditions for access to the general election ballot imposed by Texas law burden constitutionally protected rights, nevertheless those laws "are constitutionally valid measures, reasonably taken in pursuit of vital state objectives that cannot be served equally well in significantly less burdensome ways." *Post,* at 781. I dissent, however, from the Court's holding in these cases that, although the California party disaffiliation rule, Cal. Elections Code § 6830 (d) (Supp. 1974), also burdens constitutionally protected rights, California's compelling state interests "cannot be served equally well in significantly less burdensome ways."

## I

The California statute absolutely denies ballot position to independent candidates who, at any time within 12 months prior to the immediately preceding primary election, were registered as affiliated with a qualified political party. Intertwined with Cal. Elections Code §§ 2500–2501 (1961), which require primary elec-

---

[1] MR. JUSTICE DOUGLAS adheres to the views stated in his opinion dissenting in part in *American Party of Texas* v. *White, post,* p. 795.

tions to be held five months before the general election, § 6830 (d) (Supp. 1974) plainly places a significant burden upon independent candidacy—and therefore effectively burdens as well the rights of potential supporters and voters to associate for political purposes and to vote, see *Williams* v. *Rhodes, supra,* at 30; *Bullock* v. *Carter,* 405 U. S. 134, 143 (1972)—because potential independent candidates, currently affiliated with a recognized party, are required to take affirmative action toward candidacy fully *17 months* before the general election. Thus, such candidates must make that decision at a time when, as a matter of the realities of our political system, they cannot know either who will be the nominees of the major parties, or what the significant election issues may be. That is an impossible burden to shoulder. We recognized in *Williams* v. *Rhodes, supra,* at 33, that "the principal policies of the major parties change to some extent from year to year, and . . . the identity of the likely major party nominees may not be known until shortly before the election . . . ." Today, not even the casual observer of American politics can fail to realize that often a wholly unanticipated event will in only a matter of months dramatically alter political fortunes and influence the voters' assessment of vital issues. By requiring potential independent candidates to anticipate, and crystallize their political responses to, these changes and events 17 months prior to the general election, § 6830 (d) (Supp. 1974) clearly is out of step with "the potential fluidity of American political life," *Jenness* v. *Fortson,* 403 U. S. 431, 439 (1971), operating as it does to discourage independent candidacies and freeze the political status quo.

The cases of appellants Storer and Frommhagen pointedly illustrate how burdensome California's party disaffiliation rule can be. Both Storer and Frommhagen sought to run in their respective districts as inde-

pendent candidates for Congress. The term of office for the United States House of Representatives, of course, is two years. Thus, § 6830 (d) (Supp. 1974) required Storer and Frommhagen to disaffiliate from their parties within *seven months* after the preceding congressional election. Few incumbent Congressmen, however, declare their intention to seek re-election seven months after election and only four months into their terms. Yet, despite the unavailability of this patently critical piece of information, Storer and Frommhagen were forced by § 6830 (d) (Supp. 1974) to evaluate their political opportunities and opt in or out of their parties 17 months before the next congressional election.

The Court acknowledges the burdens imposed by § 6830 (d) (Supp. 1974) upon fundamental personal liberties, see *ante,* at 734, but agrees with the State's assertion that the burdens are justified by the State's compelling interest in the stability of its political system, *ante,* at 736. Without § 6830 (d) (Supp. 1974), the argument runs, the party's primary system, an integral part of the election process, is capable of subversion by a candidate who first opts to participate in that method of ballot access, and later abandons the party and its candidate-selection process, taking with him his party supporters. Thus, in sustaining the validity of § 6830 (d) (Supp. 1974), the Court finds compelling the State's interests in preventing splintered parties and unrestricted factionalism and protecting the direct-primary system, *ante,* at 736.[2]

---

[2] The Court also opines that § 6830 (d) (Supp. 1974) may be "a substantial barrier to a party fielding an 'independent' candidate to capture and bleed off votes in the general election that might well go to another party," *ante,* at 735. But the State suggests no reliance upon this alleged interest and we are therefore not at liberty to turn our decision upon our conjecture that this might have been a state objective. In any event, the prospect of such a misuse seems more fanciful than real and, as we said in *Williams* v. *Rhodes,* 393 U. S.

But the identification of these compelling state interests, which I accept, does not end the inquiry. There remains the necessity of determining whether these vital state objectives "cannot be served equally well in significantly less burdensome ways." Compelling state interests may not be pursued by

> "means that unnecessarily burden or restrict constitutionally protected activity. Statutes affecting constitutional rights must be drawn with 'precision,' *NAACP* v. *Button,* 371 U. S. 415, 438 (1963); *United States* v. *Robel,* 389 U. S. 258, 265 (1967), and must be 'tailored' to serve their legitimate objectives. *Shapiro* v. *Thompson* [394 U. S. 618, 631 (1969)]. And if there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose 'less drastic means.' *Shelton* v. *Tucker,* 364 U. S. 479, 488 (1960)." *Dunn* v. *Blumstein,* 405 U. S., at 343.

While it is true that the Court purports to examine into "less drastic means," its analysis is wholly inadequate. The discussion is limited to these passing remarks, *ante,* at 736:

> "Nor do we have reason for concluding that the device California chose, § 6830 (d) (Supp. 1974), was not an essential part of its overall mechanism to achieve its acceptable goals. As we indicated in *Rosario,* the Constitution does not require the State to choose ineffectual means to achieve its aims. To conclude otherwise might sacrifice the political stability of the system of the State, with profound con-

---

23, 33 (1968), "[n]o such remote danger can justify [an] immediate and crippling impact on . . . basic constitutional rights . . . ."

> sequences for the entire citizenry, merely in the interest of particular candidates and their supporters having instantaneous access to the ballot."

Naturally, the Constitution does not require the State to choose ineffective means to achieve its aims. The State must demonstrate, however, that the means it has chosen are "necessary." *Shapiro* v. *Thompson,* 394 U. S. 618, 634 (1969). See also *American Party of Texas* v. *White, post,* at 780–781.

I have searched in vain for even the slightest evidence in the records of these cases of any effort on the part of the State to demonstrate the absence of reasonably less burdensome means of achieving its objectives. This crucial failure cannot be remedied by the Court's conjecture that other means *"might* sacrifice the political stability of the system of the State" (emphasis added). When state legislation burdens fundamental constitutional rights, as conceded here, we are not at liberty to speculate that the State might be able to demonstrate the absence of less burdensome means; the burden of affirmatively demonstrating this is upon the State. *Dunn* v. *Blumstein, supra,* at 343; *Shapiro* v. *Thompson, supra,* at 634; *Sherbert* v. *Verner,* 374 U. S. 398, 406–409 (1963).

Moreover, less drastic means—which would not require the State to give appellants "instantaneous access to the ballot"—seem plainly available to achieve California's objectives. First, requiring party disaffiliation 12 months before the primary elections is unreasonable on its face. There is no evidence that splintering and factionalism of political parties will result unless disaffiliation is effected that far in advance of the primaries. To the contrary, whatever threat may exist to party stability is more likely to surface only shortly before the primary, when the identities of the potential field of candidates and issues

become known. See *Williams* v. *Rhodes*, 393 U. S., at 33. Thus, the State's interests would be adequately served and the rights of the appellants less burdened if the date when disaffiliation must be effected were set significantly closer to the primaries. Second, the requirement of party disaffiliation could be limited to those independent candidates who actually run in a party primary. Section 6830 (d) (Supp. 1974) sweeps far too broadly in its application to potential independent candidates who, though registered as affiliated with a recognized party, do not run for the party's nomination. Such an independent candidate plainly poses no threat of utilizing the party machinery to run in the primary, and then declaring independent candidacy, thereby splitting the party.

## II

I also dissent from the Court's remand, in the case of appellants Hall and Tyner, of the question concerning the constitutionality of the petition requirements imposed upon independent candidates. Under the relevant statutes, Hall and Tyner, candidates for President and Vice President, were required to file signatures equal to 5% of the total vote cast in California's preceding general election. § 6831. However, the pool from which signatures could be drawn excluded all persons who had voted in the primary elections, including voters who had cast nonpartisan ballots. § 6830 (c) (Supp. 1974). Furthermore, circulation of the petitions was not permitted until two months after the primaries, and the necessary signatures were required to be obtained during a 24-day period. § 6833 (Supp. 1974). The Court avoids resolving the constitutionality of these election laws by remanding to the District Court for further proceedings. On remand, the District Court is directed to determine (1) the total vote cast in the last general election as a predi-

cate to computation of the 5% of signatures required by the statutory provision, and (2) the size of the pool to which appellants were required to limit their efforts in obtaining signatures. The Court reasons that these findings are necessary to a determination "whether the available pool is so diminished in size by the disqualification of those who voted in the primary that the 325,000-signature requirement, to be satisfied in 24 days, is too great a burden .on the independent candidates for the offices of President and Vice President." *Ante*, at 740.

If such a remand were directed in the cases of Storer and Frommhagen I could agree, for in those cases there is a complete absence of data necessary to facilitate determination of the actual percentage of available voters that appellants Storer and Frommhagen were required to secure. A remand in the case of Hall and Tyner, however, is unnecessary because the data upon which relevant findings must be based are already available to us. The data are cited by the Court, *ante,* at 742 n. 12 and at 744 n. 14. Evaluated in light of our decision in *Jenness* v. *Fortson, supra,* the data leave no room for doubt that California's statutory requirements are unconstitutionally burdensome as applied to Hall and Tyner. Official voting statistics published by the California Secretary of State indicate that 6,633,400 persons voted in the 1970 general election. See Secretary of State, Statement of Vote, General Election, November 7, 1972, p. 6. Appellants were required to secure signatures totaling 5% of that number, *i. e.,* 331,670. The statistics also indicate the size of the total pool from which appellants were permitted to gather signatures. The total number of registered voters on September 14, 1972—the last day appellants were permitted to file nomination petitions—was 9,953,124. See Secretary of State, Report of Registration, September 1972, p. 8. Of that number, 6,460,220

registered voters could not sign petitions because they had voted in the 1972 primary elections. See Secretary of State, Statement of Vote, Consolidated Primary Election, June 6, 1972, pp. 3, 4–23. Thus, the total pool of registered voters available to appellants was reduced to approximately 3,492,904, of which the required 331,670 signatures was *9.5%*.[3]

In my view, a percentage requirement even approaching the range of 9.5% serves no compelling state interest which cannot be served as well by less drastic means. To be sure, in *Jenness* we acknowledged that:

> "There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election." 403 U. S., at 442.

We there upheld the constitutionality of Georgia's election laws requiring potential independent candidates to gather the signatures equal to 5% of the total eligible electorate at the last general election for the office in question. However, candidates were given a full six months to circulate petitions and no restrictions were placed upon the pool of registered voters from which

---

[3] The Court's computations, *ante,* at 744 n. 14, suggest that Hall and Tyner need only have collected signatures from 8.1% of the available voter pool. The Court's calculation assumes that the voter pool available to Hall and Tyner included approximately 579,000 persons who may have only voted in *nonpartisan* primaries. Section 6830 (c) (Supp. 1974) makes no such exception; the pool available for signatures is expressly limited to those voters who "did not vote at the immediately preceding primary election . . . ." I agree with the Court, however, that exclusion of persons voting at nonpartisan primaries is not supported by a compelling state interest.

signatures could be drawn. In that circumstance, we found that Georgia imposed no unduly burdensome restrictions upon the free circulation of nominating petitions. We noted:

> "A voter may sign a petition even though he has signed others, and a voter who has signed the petition of a nonparty candidate is free thereafter to participate in a party primary. The signer of a petition is not required to state that he intends to vote for that candidate at the election. A person who has previously voted in a party primary is fully eligible to sign a petition, and so, on the other hand, is a person who was not even registered at the time of the previous election. No signature on a nominating petition need be notarized." *Id.,* at 438–439 (footnotes omitted).

Thus, although Georgia's 5% requirement was higher than that required by most States, the Court found it "balanced by the fact that Georgia . . . imposed no arbitrary restrictions whatever upon the eligibility of any registered voter to sign as many nominating petitions as he wishes." *Id.,* at 442.

California seeks to justify its election laws by pointing to the same substantial interests we identified in *Jenness,* of insuring that candidates possess a modicum of support, and that voters are not confused by the length of the ballot. But in sharp contrast to the election laws we upheld in *Jenness,* California's statutory scheme greatly restricted the pool of registered voters from which appellants Hall and Tyner were permitted to draw signatures. The 5% requirement, in reality, forced them to secure the signatures of 9.5% of the voters permitted by law to sign nomination petitions. Moreover, unlike Georgia's six-month period for gathering signa-

tures, the California election laws required appellants to meet that State's higher percentage requirement in only 24 days. Thus, even conceding the substantiality of its aims, the State has completely failed to demonstrate why means less drastic than its high percentage requirement and short circulation period—such as the statutory scheme enacted in Georgia—will not achieve its interests.

Accordingly, I would reverse the judgment of the District Court dismissing these actions, and remand for further proceedings consistent with this opinion.