Sonya E. OSTROM and The Green Party of Kings County, Plaintiffs,

v.

**Joseph A. O'HARE, in his official capacity as Chairman of The New York City Campaign Finance Board, The New York City Board of Elections, and The New York State Board of Elections, Defendants.**

**No. CIV.A. 99–CV–6987(DGT).**

United States District Court, E.D. New York.

Sept. 14, 2001.

Raymond J. Dowd, Down & Marotta, PC, New York City, NY, for Plaintiffs.

Isaac Kaufman, City of New York Law Department, New York City, NY, for Defendant New York City Board of Elections.

Sue Ellen Dodell, New York City Campaign Finance Board, New York City, NY, for Defendants Joseph A. O'Hare and the New York City Campaign Finance Board.

## MEMORANDUM AND ORDER

TRAGER, District Judge:

Plaintiffs Sonya Ostrom ("Ostrom") and the Green Party of Kings County (the "Green Party") brought this action against Joseph A. O'Hare, the Chairman of the New York City Campaign Finance Board (the "Finance Board"), as well as the New York City Board of Elections and the New York State Board of Elections challenging the Finance Board's decision not to grant Ostrom certain election campaign finance funds as well as the constitutionality of the statutes underlying that decision. Both parties now move for summary judgment as to plaintiffs' claims.

### Background

An election was held for City Council in the 48th Council District of Kings County, New York in November of 1999. Michael Nelson was running as the incumbent for a City Council seat in that district, and, through July of 1999, the Green Party did not have a candidate contesting his seat. The Green Party's interest in the 48th Council District increased, however, in July of 1999, when Nelson voted in favor of a new lead-based paint law, Local Law 38.

Feeling that this vote was a betrayal of prior promises made by Nelson, the Green Party decided to enter a candidate into the race for his seat.

The Green Party contacted Sonya Ostrom, a retired school teacher well known in the area, along with several other potential candidates, to inquire as to whether they would be interested in running for the City Council seat in the 48th Council District. Beginning on August 9, 1999, and ending in the early morning of August 10, 1999, the Green Party held a nomination meeting where it was decided that Ostrom would be the Green Party candidate in the 48th Council District in the November election. In addition, because the Green Party did not have a local organization in Kings County up to that point, various officers were elected to serve in Kings County for the Green Party and party rules were adopted for that county. On August 18, 1999, the newly selected Secretary of the Kings County Green Party filed papers with the New York City Board of Elections to place Ostrom on the ballot as the Green Party candidate.

Under the New York City Campaign Finance Act (the "Finance Act"), candidates for City Council may qualify for public campaign funds. In order to qualify for these funds, called "matching funds" because they are paid in ratio to other contributions, the candidate must agree to certain requirements, including a limitation on the amount of contributions she will accept, a limitation on her expenditures, and certain public disclosure and auditing requirements. See N.Y.C. Admin. Code §§ 3–703(1), 3–711. In addition, the candidate for city council must receive at least $5,000 in "matchable" contributions and receive at least ten dollars from fifty or more people in the council district within which she wishes to run. Id. at § 3–703(2)(a)(iv). The application for these

matching funds must be submitted by June 1st of the election year in question. *See id.* at § 3–703(1)(c). Applications submitted after June 1st are granted only under "extraordinary circumstances," including: (1) the death of a candidate; (2) the resignation or removal of the person holding the office; or (3) the voluntary termination of the campaign of the incumbent. *Id.* at § 3–703(1)(c).

On August 19, 1999, Ostrom submitted an application for public matching funds for her campaign to the Finance Board. Because the application was filed after the June 1, 1999 deadline, Ostrom included a declaration of "extraordinary circumstances" with her application. Gordon Aff., Ex. F. Ostrom listed several reasons why she should be awarded matching funds. Initially, she pointed out that the Green Party was not operational in Kings County until August 10, 1999, so there was no mechanism by which she could not have been nominated by that party nor any officers to submit her as a Green Party candidate. Further, she noted that the filing deadline for the Green Party, as a new party under State Election Law, was not until September 14, much later than other, established parties, but the Finance Board does not allow for later applications for matching funds for new parties. Moreover, she argued that it was "reasonable to assume" that a nominee from a new party would have a later application date for matching funds. Finally, Ostrom stated that she had no foreknowledge that she was going to be a candidate until August 10, 1999, and thus could not have applied for matching funds before that date. Indeed, she could not have even formed a campaign committee that could have applied for funds. *See id.* When Ostrom submitted her application, Leo Glickman, a member of the Finance Board, told her that he "believed the petition would be granted."

On August 19, 1999 (the day of Ostrom's application) the Finance Board sent Ostrom a letter stating that the Finance Board would review the application and notify her of its decision. While the application was pending, the Finance Board posted a list of the candidates participating in the matching funds program as well as the financial information for each candidate. While Ostrom's name did not appear on the overall list of candidates receiving matching funds, it did appear on the page reciting the candidate's financial information.

The Finance Board convened at its next regularly scheduled meeting on September 16, 1999. At that meeting, the board considered and denied Ostrom's application by a unanimous vote. The Finance Board sent a letter to Ostrom on September 17, 1999, informing her that her application for matching funds had been denied, although the letter did not indicate a reason for this decision. Gordon Aff., Ex. J.

On October 7, 1999, Ostrom, through her campaign committee, appealed this denial. The committee, represented by counsel, appeared before the Finance Board and again argued that the application should have been granted in light of the fact that the Green Party did not exist in Kings County prior to August 10, 1999. This appeal was denied, and the Finance Board affirmed its original denial.

Because she was unable to obtain matching funds, Ostrom asserts that she was forced to cut back on her campaign. In total, the lack of matching funds cost Ostrom approximately $40,000. As a result, she only mailed one-third the number of campaign promotional flyers she would have mailed if she had been granted the funds. Moreover, she was unable to open a storefront as a campaign headquarters.

On October 29, 1999, Ostrom and the Green Party moved for a temporary restraining order to prevent the election from taking place in the 48th Council District. The motion was denied, but the present action continued. On November 2, 1999, the election took place, and Nelson won.

## Discussion

### (1)

### Standing

Defendants first argue that the Green Party lacks standing to challenge any of the Finance Board's decisions or any provisions of the Campaign Finance Act. The argument is based on the fact that the matching funds are applied for and distributed to individual candidates without regard to party affiliation. Therefore, the defendants maintain, the Green Party cannot establish any injury caused to it by the that statutory provision.

█ Standing requires that: (1) the party suffer an actual or imminent "injury in fact" that is "concrete and particularized"; (2) there is a causal connection between this injury and that conduct of the defendants; and (3) that the injury can be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). The issue in the present case is whether the Green Party has suffered any actual injury. Although the Green Party does not directly contest this point in its opposition papers, it does discuss what it considers to be "injuries" caused by the Finance Board rules and actions.

The first injury claimed is that the June 1, 1999 deadline "restrict[ed] the Green Party's choice of candidates to a person who already filed" for matching funds.

Pl's Mem., p. 10. In addition, the Green Party argues that newly formed parties are placed at a disadvantage based on the disjunction between the state and city deadlines. Specifically, the Green Party argues that it was not required to form as a party under State Election Law until August, *see* N.Y. Election L. § 6–128(2) (McKinney's 1998) (certificate of nomination of candidate from new party due seven weeks before election),[1] but at that point it was already too late to enter a candidate into the race in time to receive matching funds. Finally, the Green Party argues that it was deprived of a "level playing field" without notice and an opportunity to be heard in violation of the due process clause of the Fourteenth Amendment.

The problem with all of these alleged "injuries" is that they are all based on the lack of matching funds. However, the Green Party (or any other party for that matter) is never entitled to matching funds-rather, it is undisputed that campaign funds are distributed to a candidate individually. Accordingly, the Green Party did not suffer any direct injury as a result of any of the statutes or actions in dispute in the present case because it was not deprived of anything. Therefore, it would seem that the Green Party does not have standing to make any of these challenges.

We need not decide that issue, however, because there is another ground upon which the Green Party does have standing. The Green Party alleges that the free speech and associational rights of Green Party voters are being infringed by unconstitutional deadlines and policies. Although not phrased as such, these allegations can be read as an attempt to argue

---

**1.** Although the Green Party argues that the deadline for its formation was August of 1999,

the actual deadline would have fallen on September 14, 1999.

for associational standing on behalf of the Green Party members.

The modern doctrine of associational standing has developed from the Supreme Court's decision in *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). In *Warth*, the Court held that an association can bring a suit on behalf of its members if the "members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justicible case had the members themselves brought suit." *Id.* at 511, 95 S.Ct. at 2211–12. But, the Court cautioned that "the nature of the claim and the relief sought" cannot require that the members of the association be named and participate as individual parties in the lawsuit. *Id.*

■ The Court further elaborated on these principles in *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). The Court formulated the analysis for associational standing into a three part test, requiring, with respect to the association, that:

(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Id.* at 343, 97 S.Ct. at 2441.

■ The only potential issue for the Green Party in the present case is the first element. The election is over, and it would seem that the members of the Green Party were able to vote for Ostrom if they so desired and have suffered no injury that this court could redress by a decision in the Green Party's favor. As far as future elections go, the Green Party is no longer a "new party" in the 48th Council District of Kings County and will not suffer any of the same alleged injuries that stemmed from that status. The Supreme Court, however, has categorized voter challenges to the constitutionality of state candidate eligibility statutes as issues "capable of repetition, yet evading review." *Storer v. Brown*, 415 U.S. 724, 737 n. 8, 94 S.Ct. 1274, 1282 n. 8, 39 L.Ed.2d 714 (1974). As a result, such cases are not deemed moot, and the voters are able to challenge the statutes, even where the election has already come and gone and the deadlines are no longer an issue. *See id.; see also Anderson v. Celebrezze*, 460 U.S. 780, 784 n. 3, 103 S.Ct. 1564, 1567 n. 3, 75 L.Ed.2d 547 (1983) (reviewing constitutionality of Ohio deadlines for registration of independent candidates over two years after election). Consequently, the individual Green Party voters have a cognizable claim even at this point in time, and the first element in the associational standing test set forth in *Hunt* is met.

The second two elements in the *Hunt* test are easily satisfied. There is no question that the free speech and association rights of the Green Party members are germane to the Green Party's purpose. Moreover, the adjustment of the matching funds eligibility statutes or policies does not require the participation of the actual voters in this action. Accordingly, the Green Party has associational standing to pursue these claims.[2]

**2.** It should be noted that, in any event, a potential lack of standing for the Green Party would not alter the outcome or analysis in the present case. The defendants do not challenge the fact that Ostrom individually has standing, and, because the remedy requested are changes in policies or regulations, the lack of standing for the Green Party would not have any significant effect on any relief granted in this case.

## (2)

### First Amendment Rights

Although the complaint and plaintiffs' motion papers could be more clearly drafted, the plaintiffs' primary allegation appears to be that the June 1st deadline, on its face, violates the free speech and associational rights of the plaintiffs and the Green Party voters by favoring candidates from established parties over those from "new parties." The crux of the argument is that a new party need not form or nominate its candidate until seven weeks before the election, *see* N.Y. Election L. § 6–128(2) (McKinney's 1998), but candidates must apply for matching funds by June 1st of the election year. *See* N.Y.C. Admin. Code §§ 3–703(1)(C). The result is that, under state guidelines, a party can form and nominate a candidate as late as September of the election year, at which point it will be too late to enter a candidate in the race who can timely apply for matching funds. Plaintiffs argue that this causes a "grossly uneven playing field" where established parties get matching funds and "new parties" are denied such support.

The first obstacle that plaintiffs face is the fact that the present case is distinguishable from the authority upon which plaintiffs rely. Initially, the plaintiffs cite to authority related to restrictions placed on a candidate's access to the ballot. Such restrictions have been extensively reviewed by the Supreme Court. Because voters can only assert their preferences in our political system through candidates, political parties or both, "[i]t is expected that a voter hopes to find on the ballot a candidate who comes near to reflecting his policy preferences on contemporary issues." *Lubin v. Panish,* 415 U.S. 709, 716, 94 S.Ct. 1315, 1320, 39 L.Ed.2d 702 (1974). The individual's right to vote is "heavily burdened" where a statutory scheme limits the vote to major-party candidates. *Anderson,* 460 U.S. at 787, 103 S.Ct. at 1569. Moreover, "the exclusion of candidates ... burdens voters' freedom of association, because an election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying-point for like-minded citizens." *Id.* at 787–88, 103 S.Ct. at 1569.

■ Even with these important interests at stake, however, the Supreme Court has recognized that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer,* 415 U.S. at 730, 94 S.Ct. at 1279. In evaluating state-imposed burdens on a candidate's eligibility for the ballot, the Court has repeatedly cautioned that there is no "litmus test." *See id.* at 789, 103 S.Ct. at 1570. Rather, a court must undertake an analysis that "parallels its work in ordinary litigation." *Id.* First, the court must consider the "character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments." *Id.* The court must then "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by the rule." *Id.* Where the regulation imposes "severe burdens on plaintiffs' rights" it must be "narrowly tailored and advance a compelling state interest." *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358, 117 S.Ct. 1364, 1370, 137 L.Ed.2d 589 (1997). Lesser burdens, however, "trigger less exacting review," and "reasonable, nondiscriminatory restrictions" can generally be justified by the state's "important regulatory interests." *Id.* (quoting *Anderson,* 460 U.S. at 788, 103 S.Ct. at 1570).

■ Thus, the first question that must be addressed is just how great are the First Amendment burdens imposed by the June 1st deadline in the present case. They are not severe. Unlike the restrictions in *Anderson,* the regulations at issue in the present case did not prevent Ostrom, or the Green Party, from accessing the ballot; indeed, Ostrom appeared on the ballot. Moreover, contrary to plaintiffs' assertions, the Finance Board deadline is not discriminatory against new parties. Unlike the deadline in question in *Anderson,* the June 1st deadline in the present case applies equally to candidates from established parties and newly formed parties alike. *Compare Anderson,* 460 U.S. at 792, 103 S.Ct. at 1572 (Ohio deadline for independent candidate to enter name on ballot for President came before deadline for candidates from established parties). That state regulations may give newly formed parties additional time to nominate their candidates does not alter the even-handed, non-discriminatory nature of the Finance Board deadline. To hold otherwise would render every uniformly imposed deadline suspect with respect to "new parties." Indeed, it is doubtful that the lack of public funding is a burden on First Amendment rights of voters at all. *See Buckley v. Valeo,* 424 U.S. 1, 94, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976) ("the denial of public financing to some ... candidates is not restrictive of voters' rights and less restrictive of candidates' [than restrictions to ballot access]").

The minimal First Amendment burden of the June 1st deadline must now be balanced with the government's asserted justification for the deadline. *Timmons,* 520 U.S. at 358, 117 S.Ct. at 1370. Defendants argue that the burdens in the present case are justified by legitimate regulatory needs. Specifically, the defendants assert that the June 1st deadline is essential to allow sufficient time to conduct the necessary audits to ensure candidate eligibility and compliance with the matching funds' criteria. Gordon Aff., ¶ 10. The June 1st deadline allows a "brief but just adequate time to audit" disclosures made by the candidates in time to make the funds available "early enough in the campaign cycle to benefit the candidates." *Id.* Moreover, the defendants maintain that the deadline allows the Finance Board to timely post information allowing the public to know the sources from which a campaign derives its funds, and how those funds are spent. *Id.* Finally, they argue that the June 1st deadline is required to prevent candidates from surveying the field before deciding whether to run, *id.,* although it is not clear what interest the defendants have in such a goal.

There can be little doubt that defendants have sufficiently justified the minimal First Amendment burdens imposed by the June 1st deadline. Initially, as noted, the deadline is uniformly applied. As the defendants point out, a candidate does not have to be nominated by any party to apply for matching funds. In fact, it is undisputed that none of the candidates who applied for matching funds by the June 1, 1999 deadline had been nominated by a party. Thus, all parties were faced with the decision of whom to nominate after the candidates had already applied for matching funds.

Moreover, as plaintiffs concede, Ostrom's late candidacy was not initially prompted by her party, but by a perception that the incumbent had become a "turncoat" (to borrow the word used by the parties at oral argument). This is a circumstance that could happen to any political party, including a major party. It cannot be seriously contended that public financing, which is not constitutionally required to begin with, must be structured

so as to permit parties to cope with such circumstances.

Plaintiffs' final contention, that the June 1st deadline is arbitrary and unnecessary because candidates have an strong incentive to apply for matching funds as early as possible regardless of any deadline, is similarly unavailing. Plaintiffs argue that, because all candidates have a desire to receive funds as early as possible, they will apply for those funds early regardless of any deadline imposed. Thus, plaintiffs argue, the deadline is unnecessary and serves only to discriminate arbitrarily against unformed, new parties by denying them the ability to obtain matching funds. The premise that the deadline is unnecessary, however, ignores one of the primary purposes of the deadline—to allow for a proper audit of the candidate's funds. While an honest candidate with nothing to hide may have an incentive to file early in order to obtain the funds as early as possible, adopting a later deadline may allow a dishonest candidate to apply at the last minute in order to limit the amount of time available for an audit of his or her finances. Thus, there is an incentive for dishonest candidates to file as late as possible. Consequently, the June 1st deadline cannot be said to be arbitrary or unnecessary.

Under these circumstances, it is difficult to construct any cognizable constitutional challenge to the deadline. The only court to have addressed the issue in a published opinion upheld the deadline—even when it was set more than a month earlier than it currently is. *See Rogers v. New York City Board of Elections,* 988 F.Supp. 409 (S.D.N.Y.1997) (upholding matching funds application deadline when it was April 30th of the election year). Because the deadline is non-discriminatory and the minimal First Amendment burdens it imposes are clearly justified by the Campaign Finance Board's regulatory needs, plaintiffs' facial challenge to the June 1st deadline is rejected.

### (3)

### Vagueness

Plaintiffs also argue that the standard by which the Campaign Finance Board (which is composed of unelected officials) must determine whether a late application for matching funds should be accepted is unconstitutionally vague. The Finance Board will grant a late application for matching funds under "extraordinary circumstances." N.Y.C. Admin. Code § 3–703. The statute provides a list of situations that fall into the category of "extraordinary circumstances," including: (1) the death of a candidate; (2) the resignation or removal of the person holding the office; and (3) the voluntary termination of the campaign of the incumbent, *id.* § 3–703(1)(c); the parties agree, however, that this is a non-exclusive list.

Defendants argue that this list provides ample guidance for the unelected board to determine whether to grant a late application. They argue that the statute does not "materially implicate" First Amendment rights, and, accordingly, should only be struck down as unconstitutionally vague if it is "so vague and indefinite as really to be no rule or standard at all." *See Boutilier v. Immigration and Naturalization Service,* 387 U.S. 118, 123, 87 S.Ct. 1563, 1566, 18 L.Ed.2d 661 (1967) (internal quotation omitted). Moreover, defendants point out that the statute at issue in the present case is not connected with a criminal or civil penalty, it is merely a government subsidy, so it should be treated with an "even greater degree of tolerance." Def. Mem., p. 17 (citing *Gay Men's Health Crisis v. Sullivan,* 733 F.Supp. 619, 638 (S.D.N.Y.1989)).

■ Defendants' first point is unpersuasive, but the second argument carries a great deal of weight. As discussed above, the burdens on the First Amendment rights in the present case are minimal, but it cannot be said that the statutes do not implicate First Amendment concerns. *See Association of Intn'l Auto. Manuf. v. Abrams,* 84 F.3d 602, 613–14 (2d Cir.1996) (discussing standard where statute "does not involve First Amendment freedoms"). At a minimum, there is some direct impact on free speech with respect to the candidate, Ostrom. As such, the proper standard to determine vagueness is that used in the context of the First Amendment, not, as urged by defendants, the deferential standards outside the context of free speech.

■ That being said, defendants are correct that the standard set in evaluating statutes related to subsidies for speech is less demanding than the standard for statutes that impose penalties for speech. *See National Endowment for the Arts v. Finley,* 524 U.S. 569, 587–90, 118 S.Ct. 2168, 2179–80, 141 L.Ed.2d 500 (1998). In *Finley,* the Court, in reviewing discretionary standard by which grants are distributed by the National Endowment for the Arts, noted that, "although the First Amendment certainly has application in the subsidy context, we note that the Government may allocate competitive funding accordingly to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake." *Id.* at 587–88, 118 S.Ct. at 2179. "[W]hen the government is acting as patron rather than sovereign, the consequences of imprecision are not constitutionally severe." *Id.* at 589, 118 S.Ct. at 2179.

■ In the present case, the regulations are arguably even less restrictive than those in *Finley.* The Campaign Finance Act provides that qualified candidates are eligible for government subsidies of their campaign, and there is no challenge to the standards set forth for determining eligibility in the context of *timely* filing. The only challenge is to the "extraordinary circumstances" provision, which only comes into play when a candidate's application for funds is submitted late. Thus, unlike the provisions addressed in *Finley,* the challenged standard here does not constitute a bar to the subsidy in the ordinary case, only to candidates not filing on time. Accordingly, it presents an even lesser burden on the free speech of those seeking the subsidy.

On the other hand, it cannot be ignored that the present case concerns political speech, a type of expression that is at the core of the First Amendment. *See, e.g., Meyer v. Grant,* 486 U.S. 414, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988). As such, it cannot be doubted that restrictions on this speech should receive greater scrutiny than burdens on other types of speech. Similarly, then, public subsidies of this type of speech, while not as carefully scrutinized as outright bans or restrictions, should receive a more exacting scrutiny than the art subsidies at issue in *Finley.*

■ Even under a more exacting scrutiny, however, the standard in question in the present case is not impermissibly vague. The "extraordinary circumstances" language itself is relatively clear. Indeed, the Court in *Finley* pointed to a number of valid subsidizing statutes that set forth standards for qualification which were far less precise than those in the present case, such as "excellence." *See id.,* 118 S.Ct. at 2179; *see also, e.g.,* 2 U.S.C. § 802 (awards given for "initiative, achievement, and excellence among youth …"); 20 U.S.C. § 956(c)(1) (funding awarded for "progress and scholarship in the humanities"); *id.* at § 1134h(a) (fellowships awarded to "students of superior

ability selected on the basis of demonstrated achievement and exceptional promise"). Whatever additional precision is required due to the political nature of the speech in the present case is provided by the inclusion of the non-exclusive, descriptive list of "extraordinary circumstances" included in the statute. Notably, all of the situations included in this list relate to an unexpected change in the makeup of the field of candidates running for the office. *See* N.Y.C. Admin. Code § 3–703(1)(c). Thus, the standard is even further clarified by this list of descriptive examples demonstrating that, not only must the circumstances be "extraordinary," they must relate to a change in the makeup of the candidates running for the office. This is unquestionably sufficiently clear guidance for the Finance Board. Consequently, plaintiffs' argument concerning vagueness must be rejected.

### (4)

### As Applied

█ Plaintiffs also challenge the decision of the Campaign Finance Board in this particular case. The first allegation in this regard is that the Finance Board's denial of matching funds somehow "debased" or "diluted" the "weight of [the] citizen[s'] vote[s]." Pl. Mem., p. 15. This argument, which plaintiffs support by citing the Supreme Court's opinion in *Bush v. Gore,* 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000), simply does not make sense. Ostrom's name appeared on the ballot, and there is no challenge to the method by which the votes were cast or counted. Plaintiffs seem to be arguing that the lack of campaign finance somehow "diluted" the Green Party votes because, in plaintiffs' own words, "[i]t is black-letter law that money equals votes." Pl. Mem., p. 15.

Plaintiffs further support this "as applied" challenge by arguing that the "uneven playing field" was exacerbated in the present case by the failure of the Finance Board to penalize Nelson for an allegedly illegal contribution. Pl. Mem., p. 14–15. This allegation centers around the fact that Nelson apparently made a $50,000 contribution to his own campaign in a previous election. Plaintiffs claim, and defendants do not deny, that this contribution violated restrictions placed on those who receive matching funds. Plaintiffs argue that, by failing to require Nelson to remove these funds from his campaign before the present election had concluded, the Finance Board "in effect, [improperly] subsidized Nelson's campaign."

Defendants do not address these points in their brief; nonetheless, the plaintiffs' arguments are without merit. Suffice it to say that whether "money equals votes" or not, in the context of campaign finance, a lack of public money does not equal a constitutional violation. As the Supreme Court has recognized, "[m]any features of our political system-e.g., . . . the high costs of campaigning-make it difficult for third parties to succeed in American politics. . . . But the Constitution does not require . . . public financing of campaigns." *Timmons,* 520 U.S. at 362, 117 S.Ct. at 1371. Because the financing regulation in the present case is non-discriminatory, the failure of Ostrom to qualify for matching funds does not somehow "dilute" any votes cast for her. For this reason, the alleged failure of the defendants to sanction promptly the incumbent for his illegal contribution to his campaign cannot be seen as a "dilution" of anybody's vote. Consequently, this "as applied" challenge to the board's decision is rejected.

█ A second "as applied" challenge raised by plaintiffs is raised with respect to the "extraordinary circumstances" pro-

vision of the statute. Plaintiffs argue that, in deciding Ostrom's application, the Finance Board violated her First Amendment rights by considering the content of her speech. The Finance Board counters by arguing that, although the letter informing Ostrom of her denial did not give a reason, *see* Gordon Aff., Ex. J., Ostrom's application was denied not based on the content of her speech, but because her proffered reason for the delay, that the Green Party had not yet formed or nominated her, did not amount to "extraordinary circumstances." They point out that applying for matching funds is the candidate's responsibility, not the party's, and, as of the deadline of June 1st, none of the candidates had been officially nominated by their respective parties. Because Ostrom was in no different situation than any other candidate as of the June 1, 1999 deadline, the Finance Board decided she had not demonstrated "extraordinary circumstances."

Plaintiffs maintain, however, that counsel for the defendants, at the pre-motion conference held in connection with this motion, indicated that, had they known that Ostrom chose to enter the race as a result of Nelson's vote on the lead-based paint law (a ground which Ostrom failed to include in her "extraordinary circumstances" application for matching funds), they may have come to a different conclusion as to her demonstration of "extraordinary circumstances." From this allegation, Ostrom concludes that the Finance Board is making decisions to award matching funds on grounds that are not "con-

tent-neutral," in violation of the First Amendment.

To the extent that counsel for the defendants may have made such a statement, that hardly constitutes evidence that the initial decision was, in fact, based on the content of Ostrom's political message. To the contrary, it is undisputed that Ostrom never notified the Finance Board of her position on the lead-based paint law, and Ostrom submits no evidence that the Finance Board was aware of, much less considered, her political positions in deciding her application. While the result may be different in a case where there is some evidence that the Finance Board made a determination based on the political message of the party in question, the speculation that such considerations might have come into play in the present case does not support a cause of action.[3]

### (5)

### Due Process

■ Plaintiffs final constitutional claim is that the regulatory scheme in question is violative of the Due Process clause of the Fourteenth Amendment. They argue that the statutes in question rendered the "election process ... pervasively unfair." Pl. Mem., p. 16 (citing *Gelb v. Board of Elections in City of New York*, 950 F.Supp. 82, 85 (S.D.N.Y.1996)). As evidence of this "pervasive" unfairness, plaintiffs contend that Ostrom was deprived of "entitlements and privileges" by being denied matching funds and that the Green Party was entitled to have Ostrom run as their candidate-two "entitlements" that

---

**3.** Notably, however, the Supreme Court has found little problem with content-based speech discrimination in the context of government subsidies. *See, e.g., Rust v. Sullivan,* 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (upholding conditioning of federal subsidies for clinics on prohibition of distribution of abortion information). Of course, the extent to which this principle would apply in the arena of political speech-the most protected type of expression-is unclear, but this difficult question need not be addressed in the present case because there is no evidence that content played any role in the Campaign Board's decision.

were "handicapped" by the Finance Board's rejection of her application for matching funds. *Id.* Plaintiffs claim that these deprivations occurred without notice and an opportunity to be heard.

The primary problem with plaintiffs claim is that there is no indication that Ostrom or the Green Party were "entitled" to anything that they did not receive. The deprivation of a protected liberty or property interest is a prerequisite to any due process claim. *See McMenemy v. City of Rochester*, 241 F.3d 279, 285–86 (2d Cir. 2001). Neither the Green Party nor Ostrom has shown that they were deprived of any constitutionally protected interest.

With respect to the Green Party, they were not foreclosed from having Ostrom run as their candidate. Moreover, they were never entitled to any campaign funds because the funds were to be paid, if at all, to Ostrom herself. Thus, it would appear that the Green Party was not deprived of any protected interest in violation of the due process clause.

As for Ostrom, she was not entitled to matching funds unless she met the criteria set forth in the statute. These criteria required that she submit her application by June 1st or, if she could not, that she demonstrate "extraordinary circumstances." As described above, these were non-discriminatory, constitutional limitations on the distribution of matching funds. Because Ostrom failed to meet the deadline and did not demonstrate "extraordinary circumstances," she cannot demonstrate that she was entitled to matching funds.[4] Therefore, she was not deprived

of anything to which she has demonstrated an entitlement.

Because the plaintiffs have not pointed to any protected liberty or property interest to which they were entitled, they were not entitled to notice and an opportunity to be heard. In fact, Ostrom has not pointed to any authority, and research has revealed none, that requires notice and an opportunity to be heard prior to the determination whether an individual is eligible for any subsidy issued by a government agency. To the contrary, these types of determinations are made regularly without a prior hearing in the contexts of welfare, social security, government grants, and limitless other areas. While subsequent challenges to denial of such subsidies are routine, the plaintiffs in the present case have had those same avenues made available to them. Specifically, Ostrom was given an opportunity, while represented by counsel, to appeal her case to the Board. Moreover, she now has the opportunity to challenge the denial of this appeal, as well as challenging the constitutionality of the underlying regulatory provisions, in the present case. Finally, although she chose not to contest the decision on these grounds, it would seem that she could have argued that the denial of her matching funds was arbitrary and capricious, and sought Article 78 review of that decision under New York law. The fact that she failed to seek such review weighs heavily against her due process claim, if it does not foreclose the claim entirely. *See Locurto v. Safir*, 264 F.3d 154, 174-75 (2d Cir.2001).

---

**4.** Defendants also argue that, even if her application had been granted, Ostrom would still not have been entitled to matching funds unless she complied with, and qualified under, the various other requirements of § 3–703(2). However, it appears that Ostrom met these requirements: she met the donation re-

quirements (at least $5,000 in matchable contributions and fifty donations of ten dollars or more), and there is no evidence that her disclosure statement would have proved to have been inadequate. *See* N.Y.C. Admin. Code § 3–703(2).

For the foregoing reasons, plaintiffs have failed to demonstrate any due process violations in the present case. Accordingly, the defendants are entitled to summary judgment.

### (6)

### Promissory Estoppel

■ The final argument made by defendants is that plaintiffs have failed to support their promissory estoppel claim. Initially, defendants note that the alleged "promises" were not promises at all. This first statement which plaintiffs argue was a promise was the statement by Leo Glickman that "he believed [Ostrom's application] would be granted." This statement of belief was clearly not a promise, and certainly was not a statement upon which plaintiffs could justifiably rely.

■ The second alleged promise was the inclusion of Ostrom's name on one of the lists of candidates receiving matching funds. The defendants assert, and the plaintiffs do not deny, that this was simply an administrative error. Under New York law, promissory estoppel "is not available against a local government unit for the purpose of ratifying an administrative error." *United States v. Schmitt,* 999 F.Supp. 317, 360 (E.D.N.Y.1998); *see also Sheer Pleasure Lingerie, Inc. v. Town of Colonie Planning Board,* 251 A.D.2d 859, 861, 674 N.Y.S.2d 493, 495 (3d Dept.1998). Moreover, the mere inclusion of Ostrom's name on one page of the Finance Board's website cannot be seen as an unambiguous promise because the plaintiffs could have discovered the error through any reasonable diligence. *See Parkview Associates v. City of New York,* 71 N.Y.2d 274, 282, 525 N.Y.S.2d 176, 179, 519 N.E.2d 1372 (1988) (promissory estoppel not available against government entity where "reasonable diligence by good-faith inquirer" would have disclosed the true facts).

Significantly, plaintiffs have failed to contest these arguments in their papers. Indeed, they have failed to defend their promissory estoppel claims in any respect. As such, and in light of the above authority plaintiffs' promissory estoppel claim is also rejected.

### Conclusion

For the foregoing reasons, summary judgment is granted in favor of the defendant as to all of plaintiffs' claims. Plaintiffs' cross-motion for summary judgment is denied as moot. The Clerk of the Court is directed to close the case.

SO ORDERED.